**EFiled: Jul 11 2024 03:04PM EDT**
**Filing ID 73633189**
**Case Number 3,2024**

## IN THE SUPREME COURT OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| TED D. KELLNER, | § | |
| | § | No. 3, 2024 |
| Plaintiff Below, | § | |
| Appellant/Cross-Appellee, | § | Court Below: Court of Chancery |
| | § | of the State of Delaware |
| v. | § | |
| | § | C.A. No. 2023-0879 |
| AIM IMMUNOTECH INC., | § | |
| THOMAS EQUELS, WILLIAM | § | |
| MITCHELL, STEWART | § | |
| APPELROUTH, and NANCY K. | § | |
| BRYAN, | § | |
| | § | |
| Defendants Below, | § | |
| Appellees/Cross- | § | |
| Appellants. | § | |

Submitted: April 10, 2024
Decided: July 11, 2024

Before **SEITZ**, Chief Justice; **VALIHURA**, **TRAYNOR**, **LEGROW**, and **GRIFFITHS**, Justices; constituting the Court *en Banc*.

Upon appeal from the Court of Chancery. **AFFIRMED** in part, **REVERSED** in part.

John M. Seaman, Esquire, Eliezer Y. Feinstein, Esquire, ABRAMS & BAYLISS LLP, Wilmington, Delaware; Teresa Goody Guillén, Esquire, Richard Raile, Esquire (*argued*), BAKER & HOSTETLER LLP, Washington, D.C.; Marco Molina, Esquire, BAKER & HOSTETLER LLP, Costa Mesa, California; Alexandra L. Trujillo, Esquire, BAKER & HOSTETLER LLP, Houston, Texas *for Plaintiff Below, Appellant/Cross-Appellee Ted D. Kellner.*

William R. Denny, Esquire, Matthew F. Davis, Esquire, Nicholas D. Mozal, Esquire, Caneel Radinson-Blasucci, Esquire, Eric J. Nascone, Esquire, POTTER ANDERSON & CORROON LLP, Wilmington, Delaware; Stefan Atkinson, Esquire (*argued*), Mary T. Reale, Esquire, Mason E. Reynolds, Esquire, Joseph Taglienti,

Esquire, KIRKLAND & ELLIS LLP, New York, New York; Michael F. Williams, Esquire, Don Hong, Esquire, KIRKLAND & ELLIS LLP, Washington D.C. *for Defendants Below, Appellees/Cross-Appellants AIM ImmunoTech Inc., Thomas Equels, William Mitchell, Stewart Appelrouth, and Nancy K. Bryan*.

Brett M. McCartney, Esquire, Sarah T. Andrade, Esquire, BAYARD, P.A., Wilmington, Delaware; Edward J. Fuhr, Esquire, Steven M. Haas, Esquire, Johnathon E. Schronce, Esquire, James M. Lockerby, Esquire, HUNTON ANDREWS KURTH LLP, Richmond, Virginia *for Amicus Curiae, Chamber of Commerce of the United States of America, in support of Appellees*.

**SEITZ**, Chief Justice:

A group of AIM ImmunoTech, Inc. stockholders thought that the board of directors was mismanaging the company. They launched an activism campaign and proxy contest to elect new directors. The insurgents included two felons convicted of wire fraud, insider trading, and other crimes. The campaign escalated into two attempts to nominate directors to the AIM board.

The board rejected both nomination notices under its existing bylaws, which led to a lawsuit over the second notice. The Court of Chancery denied the insurgents' request for a mandatory preliminary injunction to place their nominees on the annual meeting ballot. The court held that factual disputes about the veracity of the insurgents' disclosures precluded temporary mandatory injunctive relief.

Undeterred, the insurgents reshuffled their membership, with Ted D. Kellner leading a third attempt to nominate three new directors to the AIM board. Meanwhile, the board amended its bylaws to include sweeping new advance notice provisions. The amended bylaws required detailed disclosures by Kellner and his nominees. Many of the amendments were approved by the AIM board as a direct response to the insurgents' campaign.

The AIM board once again rejected Kellner's nominations for failing to comply with the new advance notice bylaws. Kellner filed suit. After trial, the Court of Chancery invalidated four of the six main advance notice bylaws and reinstated

3

the 2016 version of one of the invalidated bylaws. Ultimately, the court upheld the board's rejection of the third nomination notice because it failed to comply with the two advance notice bylaws left standing, including the reinstated 2016 bylaw provision.

On appeal, Kellner argues that the court improperly used the 2016 bylaw to reject his notice because the AIM board did not rely on it as a basis for rejection. In addition, according to Kellner, the enactment of the amended bylaws repealed the 2016 bylaw, which meant that the court had no basis to reinstate it. He also argues that the court erred when it held that two of the amended bylaws withstood enhanced scrutiny when, at the same time, the court found that many of the other bylaws were preclusive and adopted for an improper purpose. Finally, Kellner contends that the court erred when it found that the nomination notice did not comply with the amended bylaws left standing.

By way of cross appeal, the defendants object to the Court of Chancery's invalidation of four of the amended bylaws. As they argue, the Court of Chancery erred when it confused a "facial" challenge to the bylaws with an "as-applied" challenge. According to the defendants, Kellner brought only an as-applied challenge. The court, therefore, should not have invalidated the amended bylaws. The defendants also contend that, in any event, the amended bylaws withstand enhanced scrutiny review.

4

In a challenge to the adoption, amendment, or enforcement of a Delaware corporation's advance notice bylaws that is ripe for judicial review, the court should consider the following: first, if contested, whether the advance notice bylaws are valid as consistent with the certificate of incorporation, not prohibited by law, and address a proper subject matter; and second, whether the board's adoption, amendment, or application of the advance notice bylaws were equitable under the circumstances of the case.

Applying this framework to the current appeal, we hold that: (1) one "unintelligible" bylaw is invalid; (2) the remaining amended advance notice bylaws subject to this appeal are valid because they are consistent with the certificate of incorporation, not prohibited by law, and address a proper subject matter; and (3) the AIM board acted inequitably when it adopted the amended bylaws for the primary purpose of interfering with, and ultimately rejecting, Kellner's nominations. Thus, the remaining bylaws challenged on appeal are unenforceable.

I.

A.

We rely on the facts as found after trial.[1] AIM ImmunoTech, Inc. is a publicly traded pharmaceutical company incorporated in Delaware and headquartered in

---

[1] *Kellner v. AIM ImmunoTech Inc.*, 307 A.3d 998 (Del. Ch. 2023).

5

Florida. AIM develops treatments for immune system disorders, viral diseases, and cancers. Its lead product is the investigational drug Ampligen. AIM has a four-member board of directors – Thomas Equels, William Mitchel, Stewart Appelrouth, and Nancy K. Bryan. Equels is AIM's Chief Executive Officer, having served in his role since 2008. Mitchell, a scientist who has studied Ampligen since the 1980s, is the chairman of the board. Appelrouth, an accountant, has served on the board since 2016. Bryan, the President of BioFlorida Inc., an LLC of which AIM is a member, is the latest addition, beginning her board tenure in March, 2023. The directors and the company are the defendants in the litigation.

Ted D. Kellner, the plaintiff in this litigation, is a retired founder, portfolio manager, philanthropist, minority owner of a professional basketball team, and a major AIM stockholder. In 2023, Kellner sought to nominate a competing slate of directors to serve on the AIM board. The competing slate of directors was Kellner himself, Todd Deutsch, and Robert Chioini. Deutsch, a private investor, has known Kellner for over two decades and is the owner of about 3.5% of AIM's shares. Chioini is the co-founder of Rockwell Medical Technologies, a dialysis company, and was its Chief Executive Officer until the Rockwell board terminated his employment in 2018. Chioini is not an AIM stockholder.

Deutsch and Chioini were both involved in a prior nomination effort led by Franz Tudor – a business associate of Deutsch. The prior nomination dispute was

6

the subject of a separate and related Court of Chancery action – *Jorgl v. AIM ImmunoTech, Inc.* – where Tudor led the effort to place nominees on AIM's universal proxy card.[2] In 2009, Tudor pleaded guilty to securities fraud and insider trading. Tudor is permanently enjoined from engaging in certain activities relating to penny stocks – a class of microcap publicly-traded companies that includes AIM.

### B.

Since 2016, AIM's stock price has fallen precipitously. In the summer of 2020, Tudor contacted AIM management. He wanted to "be taken seriously."[3] Tudor told the board that he represented over one million AIM shares between his ownership and the funds he consults. He sought a formal role with AIM. Equels investigated Tudor's past and discovered his criminal background.

When AIM management did not respond, Tudor attempted to contact other directors and AIM representatives but, once again, was ignored. Tudor began to represent to third parties that he was formally associated with AIM. In response, AIM demanded that Tudor stop his misrepresentations. Tudor ignored the demand, which caused AIM to file suit against him in Florida state court. Tudor eventually

---

[2] *Jorgl v. AIM ImmunoTech Inc.*, 2022 WL 16543834 (Del. Ch. Oct. 28, 2022).

[3] *Kellner*, 307 A.3d at 1007 (quoting the record).

agreed to a stipulated permanent injunction, which enjoined Tudor from contacting any of AIM's business relationships regarding AIM or its products and activities.[4]

Other Tudor associates joined the pressure campaign. Deutsch, Tudor's former colleague, who had suffered significant losses from his AIM investment, began working with Tudor to engage with the board. Tudor also recruited others to the activism effort: Chioini – whom he had worked with at Rockwell – and acquaintances Daniel Ring and Walter Lautz. Lautz sent AIM a notice to nominate Ring and Chioini to the board. Tudor drafted the notice without Lautz's review. It did not mention Tudor or his involvement in the nomination.

The AIM board rejected Lautz's notice for noncompliance with federal securities law. In reaction to the rejection, Chioini sought financial support from his fellow Rockwell co-founder, Michael Xirinachs. Later, in the same year, Xirinachs pleaded guilty to criminal charges involving fraudulent securities trading, promotion and material misrepresentations to investors, and misuse of funds.

Chioini sent Xirinachs a copy of AIM's bylaws and flagged the advance notice provisions. Tudor began working with counsel at Baker & Hostetler LLP on a

---

[4] *AIM ImmunoTech, Inc. v. Tudor*, No. 21-CA-393 (Fla. Cir. Ct. Aug. 13, 2021) (order granting permanent injunction).

potential proxy contest. He continued to contact AIM about his nomination effort. Tudor was met with silence to which he responded, "you now get the gloves off."[5]

Meanwhile Deutsch kept Kellner, his fellow AIM stockholder, apprised of the nomination effort. Kellner first purchased AIM stock in early 2021 at Deutsch's suggestion. Deutsch would send Kellner information from Tudor about AIM's stock performance – mostly by forwarding him emails written by Tudor. Kellner saw promise in AIM but, like the other insurgents, thought it was mismanaged. One day after the Lautz nomination notice, Deutsch sent Kellner an investment analysis prepared by Tudor. Kellner marked up the analysis by hand and scribbled "48 million shares. What do we own? 15 to 18%[?]"[6] Kellner was later surprised to learn that Tudor owned significantly fewer shares than Kellner had believed. Deutsch vouched for Tudor, stating "I promise [you] he is as smart [as] they come in [the] space."[7] Kellner answered that Tudor "doesn't need to worry nor you about Teddy!!![13 emojis, including thumbs up and smiley faces]."[8]

At this point the nomination effort hit another obstacle. Tudor expected Lautz to submit a new nomination notice to the board. But Lautz told Tudor that he had

---

[5] *Kellner*, 307 A.3d at 1010 (quoting the record).

[6] *Id.* at 1009 (quoting the record).

[7] *Id.* at 1011 (quoting the record).

[8] *Id.* (alteration in original) (quoting the record).

been the subject of "a FINRA investigation" and "was terminated from one of the largest brokerage houses on the planet," which "may not be a good look" for the nomination effort.[9] AIM's counsel later told Deutsch, Kellner, and Tudor's counsel that they had to comply with Section 13(d) of the Securities and Exchange Act of 1934. The advice came about after counsel learned that Deutsch was attempting to have Tudor attend "as an undisclosed party, a telephone conference between AIM's [investor relations] firm," Deutsch, and Kellner.[10] The AIM communication revealed to Kellner, for the first time, that Tudor was a felon subject to a permanent injunction against AIM.[11] Kellner hand wrote on a printed copy of AIM's letter, "FRANZ TUDOR – IS A FELON?" and "INSIDER TRADING?"[12] Kellner also wrote the names "Robb [sic] Chioini" and "Michael Zeaniack [Xirinachs]," noting: "our plans – get a lawyer."[13]

Ring dropped out and with Lautz no longer the nominator, the nomination effort needed both a stockholder to make the nomination and a new nominee. Chioini recruited a business associate, Michael Rice, to be his co-nominee. Rice

---

[9] *Id.* at 1011 (quoting the record).

[10] *Id.* (alteration in original) (quoting the record).

[11] *Id.* at 1012.

[12] *Id.* (quoting the record).

[13] *Id.* (quoting the record).

supplied the face of the investor, a friend he surfed with – Jonathan Jorgl. Jorgl had never heard of AIM when Rice made his request. Rice and Xirinachs made sure that Jorgl held shares recorded to his name before the nomination deadline.

On July 8, 2022, Jorgl submitted a notice with Chioini and Rice as his proposed nominees. Shortly thereafter, AIM rejected Jorgl's nomination notice because the notice, as AIM's General Counsel put it, "fail[ed] to satisfy Section 1.4 of [AIM's] [b]ylaws and applicable law by, among other things, making false and misleading statements in lieu of providing [the required] information."[14] Section 1.4(c) of AIM's bylaws, as adopted in 2016, required a stockholder proposal to disclose "arrangements or understandings . . . pursuant to which the nomination(s) are to be made."[15]

AIM's rejection triggered the first round of litigation in the Court of Chancery, *Jorgl v. AIM ImmunoTech, Inc.*[16] Following expedited discovery, the court declined to grant Jorgl judgment as a matter of law because, on the record before it, the court could not conclude that Jorgl's nomination notice complied with the existing bylaw requirements. The court also concluded that the "swirl of lingering factual disputes"

---

[14] *Id.* at 1013 (alterations in original) (quoting the record).

[15] *Id.* (quoting the record).

[16] 2022 WL 16543834.

also precluded mandatory preliminary injunctive relief.[17]   AIM continued to prosecute claims in Florida against Tudor, Deutsch, Kellner, Jorgl, Lautz, Chioini, and Rice.  In the Florida action, AIM alleged that the investor group violated Section 13(d) of the Exchange Act – later amending its complaint to drop Chioini and Rice. AIM sought an injunction against the group to prohibit them from further violating federal securities law.[18]

Meanwhile, Kellner prepared for AIM's 2022 annual meeting.  He drafted an update to his college investment club, for which he managed the investment portfolio, which included AIM stock.  In the update, Kellner said he was "now a party to that proxy fight."[19]  Kellner attended AIM's annual meeting in person.  He was disappointed by the lack of engagement and felt "angry" over what had occurred.[20]  Kellner reached out to the investment group to gauge their level of commitment to continue their nomination efforts.

## C.

Following the 2022 annual meeting, the AIM board took a new look at its governance structure.  In response to stockholder feedback, the board sought to add

---

[17] *Id.* at *17.

[18] *AIM ImmunoTech, Inc. v. Tudor et al.*, No. 5:22-cv-323 (M.D. Fla.).  The court dismissed the complaint as moot following the 2022 annual meeting.

[19] *Kellner*, 307 A.3d at 1013 (quoting the record).

[20] *Id.* at 1014 (quoting the record).

additional directors who would "bring diversity and additional biotechnology commercialization experience."[21] Chioini viewed this as an opportunity to get onto the board. He instructed his counsel, John Harrington of BakerHostetler, to relay to AIM his and Rice's continued interest. Harrington informed AIM's Delaware counsel at Potter Anderson & Corroon LLP that Chioini and Rice wanted to "avoid another proxy contest" and instead would be amenable to "mutually agreeable directors" joining the board.[22] Harrington stressed that they were otherwise "ready to come out guns blazing" next year.[23] Soon after, Chioini and Kellner spoke for the first time. Chioini told Harrington that Kellner was "very interested in working with [them] to remove these guys" and "want[ed] to keep in touch."[24]

Before the 2023 annual meeting, the board considered amendments to AIM's advance notice bylaws. The board engaged Potter Anderson for the review. Potter Anderson circulated a proposed set of amendments. The proposed bylaw amendments were intended to respond "to significant activist activity during 2022 in which an activist group . . . engag[ed] in efforts to conceal who was supporting and who was funding the nomination efforts and to conceal the group's plans for the

---

[21] *Id.* (quoting the record).

[22] *Id.* at 1015 (quoting the record).

[23] *Id.* (quoting the record).

[24] *Id.* (alterations in original) (quoting the record).

13

Company," and to modernize and bring the bylaws in line with recent amendments to the Delaware General Corporation Law ("DGCL") and federal law.[25] Potter Anderson presented the amendments at a board meeting where counsel discussed the Jorgl nomination. The board concluded that the bylaw provisions were not "preclusive or unreasonably restrictive" of stockholders' ability to make proposals or nominations.[26] The board made minor changes and thereafter adopted the bylaws by unanimous vote (the "Amended Bylaws").[27]

As the third nomination effort commenced, Tudor, who was supposedly employed by Deutsch to do back-office tasks, dropped out of sight. The remaining individuals were Kellner, Deutsch, Chioini, and Rice. They met with their counsel to strategize. Kellner promised to fund the effort if Chioini and Deutsch also made a smaller contribution. Kellner, Deutsch, and Chioini signed an engagement letter with BakerHostetler.[28]

BakerHostetler contacted AIM on Kellner's behalf to request the company's director and officer (D&O) questionnaire and a representation and agreement referred to in the Amended Bylaws. The Amended Bylaws gave AIM five days to

---

[25] *Id.* at 1016 (quoting the record).

[26] *Id.* (quoting the record).

[27] A408.

[28] A541.

14

complete and send the questionnaire, during which the board revised the questionnaire to require additional information from Kellner and his nominees. Kellner submitted a Schedule 13D filing with the Securities and Exchange Commission. Equels contacted the board to schedule a discussion about the "second attempt of [a] hostile takeover."[29] On August 3, 2023, the evening before the nomination deadline – Kellner submitted his notice that he intended to nominate himself, Chioini, and Deutsch as director candidates at the 2023 annual meeting.[30]

The twenty-page notice contained lengthy disclosures.[31] It contained information regarding the nominees such as: biographical details;[32] employment history;[33] group agreements;[34] statements on affiliations with Lautz, Tudor, Rice, Jorgl, and Xirinachs;[35] prior board service;[36] meeting dates;[37] equity ownership in

---

[29] *Kellner*, 307 A.3d at 1018 (alteration in original) (quoting the record).

[30] A683.

[31] A683–702.

[32] A685.

[33] *Id.*

[34] A688.

[35] A690–91.

[36] A692.

[37] A693.

15

AIM and its competitors by the nominees and their families;[38] and intent to solicit stockholders.[39] Notably, the notice rejected the existence of any sort of agreement, arrangement, or understanding ("AAU") involving Tudor for the Jorgl nomination;[40] disclosed that Chioini had no AAUs with Lautz or Tudor, despite Chioini having been nominated by Lautz in the invalid 2022 attempt;[41] disclosed no AAUs of Chioini despite Chioini incurring significant legal fees with no equity ownership of AIM stock;[42] and did not disclose any AAU of Xirinachs, despite his financial support of the activist effort.

The nominees' D&O questionnaires contained information regarding the nominees such as their: educational background;[43] trade qualifications;[44] prior board

---

[38] A697–99.

[39] A701.

[40] A690.

[41] *Id.*

[42] A689.

[43] A717.

[44] *Id.*

16

service;[45] criminal history;[46] financial information;[47] regulatory action;[48] diversity;[49] group agreements;[50] economic interest in the nomination;[51] and social media presence.[52]

Four days later, AIM's outside communications advisor sent a draft press release concerning the nomination to Equels, AIM's counsel, and AIM's investor relations team. The draft stated, "[a] hostile takeover of the Board would not only put shareholders' investments at risk, it would also be detrimental to the patients for whom we are working to bring new life-saving oncology therapies to market – most notably by repurposing our lead drug, Ampligen."[53] Counsel recommended revisions to the messaging as "no determination ha[d] been made yet as to whether the notice complies with AIM's advance notice bylaws."[54]

---

[45] A718.

[46] *Id.*

[47] *Id.*

[48] A722.

[49] A724.

[50] A730.

[51] A732.

[52] A733.

[53] *Kellner*, 307 A.3d at 1018 (alteration in original) (quoting the record).

[54] *Id.* (alteration in original) (quoting the record).

The board met over three sessions in a two-week period to discuss the nomination. In an August 8 meeting, Equels emphasized that "protecting stockholders was paramount" considering the overlapping people between the prior and current nomination efforts and their troubling backgrounds.[55] The board hired Potter Anderson and Kirkland & Ellis LLP to evaluate the notice. In addition, AIM filed a motion seeking to revive the dismissed Florida action, characterizing the Kellner notice as misleading and a continuation of the 2022 activism.[56] Based on the omissions and misstatements, AIM's complaint characterized Kellner, Deutsch, and the other group members as posing an "ongoing . . . threat to AIM and its shareholders."[57]

At the August 21 meeting, counsel advised the board that the Kellner notice did not comply with the Amended Bylaws. Specifically, absent from the notice, as interpreted by counsel, were: (1) undisclosed AAUs among the activists; (2) disclosure of known supporters of the nomination; (3) disclosure of the specific date, rather than windows of time, of first contact between the activists; and (4) other information, such as past adverse recommendations for public board service from independent proxy advisory firms. After explaining the purported deficiencies,

---

[55] *Id.* at 1019 (quoting the record).

[56] *AIM ImmunoTech, Inc. v. Tudor et al.*, No. 5:22-cv-323 (M.D. Fla.). The motion was denied.

[57] *Kellner*, 307 A.3d at 1019 (quoting the record).

counsel reviewed litigation options with the board. The board concluded that it required additional time to consider its course of action.

The following morning, the board reconvened to reject unanimously Kellner's nomination notice for not complying with the Amended Bylaws. The board concluded that the notice was "designed to omit and conceal information and to provide incomplete or misleading disclosures that destabilize the important disclosure function that [AIM's] Advance Notice Provisions were designed to serve."[58] The board authorized a letter to notify Kellner of the rejection. AIM's counsel notified BakerHostetler of the rejection by letter.[59] The rejection letter sent to Kellner, which explained the various disclosure deficiencies, stated that the deadline for submitting a timely notice had passed. The board would not, therefore, consider an updated notice for the 2023 annual meeting. Kellner issued a press release announcing that he had filed litigation and urged AIM stockholders to disregard board proxy contest communications.

The rejection letter described several instances of non-compliance with AIM's bylaws – but was primarily focused on the deficient disclosure of AAUs.[60] The notice alleged that Kellner failed to disclose various AAUs relating to the 2022 and

---

[58] *Id.* at 1020 (alteration in original) (quoting the record).

[59] A1055.

[60] A1055–68.

19

2023 annual meetings.[61]  Among other things, AIM found it not credible that nominee Chioini had no AAUs other than the July 2023 agreement based on the factual history between the company and the insurgents, as well as the fact that Chioini owned no shares of AIM and expended both time and money on the nomination effort.[62]  Similarly, AIM doubted that Xirinachs lacked AAUs given his extensive history of working with Chioini and Tudor on nominating new board members.[63]

Additionally, the letter identified "other" instances of "material" omissions, such as:  providing materially false information regarding nominee qualifications;[64] material omission of nominee biographical information;[65] failure to disclose certain affiliations;[66] failure to disclose certain ownership information;[67] failure to disclose

---

[61] A1057, 59.

[62] A1060.

[63] *Id.*

[64]*Id.*

[65] A1062.

[66] *Id.*

[67] A0163.

relevant dates;[68] failure to disclose information required by the proxy rules;[69] and making an inaccurate certification regarding compliance with legal requirements.[70]

D.

Kellner filed a complaint in the Court of Chancery, naming AIM and its board members as defendants.[71] In his complaint, Kellner asked for declarations that the Amended Bylaws are unlawful, or in addition and in the alternative, that the defendants' application of the bylaws to reject his notice is unlawful and/or inequitable; that each of Equels, Mitchell, and Appelrouth breached their fiduciary duties by adopting the Amended Bylaws; and that the board breached its fiduciary duties by rejecting the notice under the Amended Bylaws.[72] The defendants answered and counterclaimed against Kellner, seeking declarations that: the Amended Bylaws are lawful and valid; the notice did not comply with the Amended Bylaws; the notice was lawfully and validly rejected for failing to comply with the Amended Bylaws; and that AIM's directors did not breach their fiduciary duties by

---

[68] A1064.

[69] *Id.*

[70] A1067.

[71] B588.

[72] B635.

21

adopting the Amended Bylaws or by rejecting Kellner's notice.[73] Following a three-day expedited trial, the court concluded that many of the provisions in the Amended Bylaws were invalid, but the board's rejection of Kellner's nominations was nevertheless equitable.[74]

First, the court determined that the Amended Bylaws were not adopted on a clear day.[75] As such, the court treated the Amended Bylaws adoption as a defensive measure, applied the enhanced scrutiny standard of review, and placed the burden of proof on the defendants.[76] The court focused its analysis on six bylaws used to support the notice's rejection:

- Section 1.4(c)(1)(D), "the **AAU Provision**," requiring "a complete and accurate description of all agreements, arrangements or understandings [AAUs] (whether written or oral, and including promises)" between a broadly defined group of people including any "Holder" and "Stockholder Associated Person [SAP]," "with respect to the nominations or [AIM] . . . existing presently or existing during the prior twenty-four (24) months . . . ."[77]

  o A Holder is defined as "the Noticing Stockholder and each beneficial owner, if any, on whose behalf the nomination is made or other business is being proposed."[78]

---

[73] Dfs.' Ans. Ver. Compl. and Ver. CC. at 100.

[74] *Kellner*, 307 A.3d at 1045.

[75] *Id.* at 1024.

[76] *Id.*

[77] A409.

[78] A412.

22

- A SAP is defined "as to any Holder, (i) any person acting in concert with such Holder with respect to the Stockholder Proposal or the Corporation, (ii) any person controlling, controlled by, or under common control with such Holder or any of their respective Affiliates and Associates, or a person acting in concert therewith with respect to the Stockholder Proposal or the Corporation, and (iii) any member of the immediate family of such Holder or an Affiliate or Associate of such Holder."[79]

- Section 1.4(c)(1)(E), "the **Consulting/Nomination Provision**," requiring disclosure of AAUs "between or among each Holder and/or any Stockholder Associated Person . . . to consult or advise on any investment or potential investment in a publicly listed company . . . and/or . . . to nominate, submit, or otherwise recommend the Stockholder Nominee for appointment, election or re-election . . . to any officer, executive officer or director role of any publicly listed company . . . during the past ten (10) years . . . ."[80]

- Section 1.4(c)(4), "the **Known Supporter Provision**," requiring the names and contact info "of other stockholders . . . known by any Holder or Stockholder Associated Person to support such Stockholder Proposal or Stockholder Proposals . . . ."[81]

- Section 1.4(c)(3)(B), "the **Ownership Provision**," a 1,099-word run-on sentence of 13 subsections, requiring, among other things, disclosures relating to ownership of any equity interest in AIM and "any principal competitor" of AIM, by a broadly defined group of people including SAPs.[82]

- Section 1.4(c)(1)(H), "the **First Contact Provision**," requiring "the dates of first contact between any Holder and/or Stockholder Associated Person, on the one hand, and the Stockholder Nominee, on the other hand, with respect

---

[79] *Id.*

[80] A409.

[81] A411.

[82] A410. Mitchell, AIM's board chair, testified that if the directors had read the bylaw "line by line" they "would still be in the meeting." *Kellner*, 307 A.3d at 1034 (quoting the record). Like AIM's board, we will not lengthen this opinion by reviewing line-by-line the Ownership Provision's requirements.

23

to (i) [AIM] and (ii) any proposed nomination or nominations of any person or persons (including, without limitation, any Stockholder Nominee) for election or re-election to the Board of Directors."[83]

- Sections 1.4(c)(1)(L) and 1.4(e), "the **Questionnaire Provisions**," requiring director nominees to complete a form of the D&O questionnaire. Upon request for a form questionnaire, the corporate secretary must issue the form within five business days. The form questionnaire required disclosure, "to the extent known" of any adverse recommendations by proxy advisory firms.[84]

Next, the court considered whether the board responded to a legitimate threat.[85] The court held that, given the composition and history of the insurgent group, the board was reasonable when it concluded that it faced a threat to its objective of gathering complete information regarding director nominations, including the identity of those making and supporting the nominations.[86]

The court reviewed next whether the board's defensive acts were reasonable and not preclusive of a proxy contest.[87] After engaging in a context-specific analysis of each of the six provisions, the court held that four of the six challenged bylaws were inequitable and "facially invalid." The four invalidated bylaws, and the court's reasoning, follow:

---

[83] A409.

[84] A410–11.

[85] *Kellner*, 307 A.3d at 1025–26 (citing *Coster v. UIP*, 300 A.3d 656 (Del. 2023)).

[86] *Id.* at 1026.

[87] *Id.* at 1027.

- The **AAU Provision** was more "akin to tripwire than an information gathering tool."[88] The bylaw's disclosure requirements coupled with the definition of a SAP resulted in vague and overbroad requirements ripe for subjective interpretation by the board.[89]

- The **Consulting/Nomination Provision** imposed ambiguous and onerous requirements across a lengthy term. The provision contains the same SAP requirement as the AAU and goes even further than the AAU, by requesting any investment advice involving any public company over a ten-year term. The court concluded that "[a]t worst, it is draconian," because "it would give the board license to reject a notice based on a subjective interpretation of the provision's imprecise terms."[90]

- The **Known Supporter Provision** was vague about what qualifies as "support." A similar bylaw, which withstood scrutiny in a separate action in the Court of Chancery, only requested "financial" information. The bylaw here was unqualified in the nature of the support sought, and therefore impeded the stockholder franchise.[91]

- The **Ownership Provision** was "indecipherable" and seemingly designed to preclude a proxy contest."[92]

The court found that the First Contact and Questionnaire Provisions survived enhanced scrutiny review. As the court held, the First Contact Provision was not preclusive because the information requested was readily discernible.[93] And Kellner

---

[88] *Id.* at 1030.

[89] *Id.*

[90] *Id.* at 1031.

[91] *Id.* at 1032 (citing *Rosenbaum v. CytoDyn, Inc.*, 2021 WL 4775140, at *19 (Del. Ch. Oct. 13, 2021)).

[92] *Id.* at 1034.

[93] *Id.* at 1035.

only challenged the timing aspect of the Questionnaire Provisions, which the court held was reasonable.[94]

After finding the AAU Provision "invalid," the court reverted to AIM's prior, valid AAU version.[95] The 2016 AAU Provision, which the court reviewed in the *Jorgl* litigation and was a subset of the 2023 AAU Provision, lacked the SAP terms which rendered the 2023 AAU Provision inequitable.[96] Central to the court's reasoning was that "[g]iven the vital corporate considerations at risk if nominating stockholders conceal AAUs, it would risk further inequity to excuse the Kellner Notice from disclosing them when AIM had a validly enacted provision in place pre-amendment."[97]

The court then held that Kellner's notice and the director nominees' D&O responses did not comply with the 2016 AAU Provision, the First Contact Provision, and the Questionnaire Provisions. Specifically, the court ruled that: the notice was misleading because it did not disclose the actual date when an AAU among Kellner,

---

[94] *Id.* at 1036.

[95] *Id.* at 1038 (citing *Hollinger Int'l, Inc. v. Black*, 844 A.2d 1022 (Del. Ch. 2004), *aff'd*, 872 A.2d 559 (Del. 2005); *Rainbow Mountain, Inc. v. Begeman*, 2017 WL 1097143 (Del. Ch. Mar. 23, 2017)).

[96] *Id.* (citing *Jorgl*, 2022 WL 16543834, at *11); A277–78.

[97] *Kellner*, 307 A.3d at 1038.

Deutsch, and Chioini arose;[98] Kellner did not disclose the date of his first contact with Deutsch and only provided a vague date for his contact with Chioini;[99] and the D&O responses were false as all three of the nominees had prior adverse recommendations from proxy advisors.[100] In light of the noncompliance with the prior version of the bylaws, the court held that, after applying enhanced scrutiny, the board acted reasonably when it rejected Kellner's notice.[101] The court also found that the board's actions were not manipulative nor was the rejection "preordained," and the nominees were the ones engaging in manipulative conduct.[102]

The Court of Chancery concluded as follows: "[r]egarding Kellner's claim concerning the validity of the Amended Bylaws and AIM's counterclaim, judgment is entered for Kellner in part and for AIM in part. Regarding Kellner's claim concerning his compliance with the Amended Bylaws and the board's rejection of the Kellner Notice, judgment is entered in favor of the defendants."[103]

---

[98] *Id.* at 1040.

[99] *Id.* at 1041.

[100] *Id.*

[101] *Id.* at 1042–43.

[102] *Id.* at 1043–44.

[103] *Id.* at 1044–45.

E.

Kellner raises three issues on appeal.[104] First, he claims that the court erroneously determined that his notice was deficient under the 2016 AAU Provision.[105] He argues that the board did not rely on the 2016 AAU Provision to reject his notice, and therefore the court cannot apply an after-the-fact reason for the board's rejection.[106] In the alternative, he argues that the 2016 AAU Provision was repealed in March 2023 and therefore cannot support the rejection many months later.[107]

Next, according to Kellner, the court erred by concluding that certain bylaw amendments satisfied enhanced scrutiny.[108] He argues that the court failed to evaluate "inextricably related bylaws together" and that it cannot be the case that some bylaws were inequitably designed to thwart the nomination effort while others supported an equitable rejection of the notice.[109] And regardless, he claims, the isolated provisions the court upheld fail enhanced scrutiny.[110]

---

[104] Opening Br. at 3.

[105] *Id.*at 12.

[106] *Id.*

[107] *Id.* at 15.

[108] *Id.* at 18.

[109] *Id.* at 19 (citing *Unitrin, Inc. v. Am. Gen. Corp.*, 651 A.2d 1361, 1387 (Del. 1995)).

[110] *Id.* at 27.

Kellner also argues that the First Contact Provision is inequitable because it serves no important corporate interest, is preclusive, and unreasonable.[111] Further, according to Kellner, the Questionnaire Provisions solicited unimportant information and the five-business-day window to produce the questionnaire allowed for gamesmanship by the board.[112] Kellner points out that the court did not address the portion of Kellner's complaint that sought a declaration that the board violated its fiduciary duties – despite finding four of the bylaws inequitable.[113]

Finally, Kellner argues that the court erroneously upheld the rejection by not applying the Amended Bylaws properly to the notice.[114] He contends that his notice complied in all material respects with the 2016 AAU Provision and would have ensured an informed stockholder vote.[115] Kellner also argues that the notice complied with the First Contact Provision and Questionnaire Provisions by providing the dates of first contact, and that the nominees disclosed the adverse recommendations by proxy advisors "to the extent known."[116]

---

[111] *Id.*

[112] *Id.* at 29.

[113] *Id.* at 31.

[114] *Id.* at 32.

[115] *Id.* at 33, 37.

[116] *Id.* at 43–44.

The defendants raise three issues on cross-appeal and ask that we affirm the rest of the court's decision.[117] First, they contend that the court misconstrued Kellner's as-applied challenge as a facial challenge.[118] According to the defendants, Kellner made only an as-applied challenge.[119] Second, they claim the court misapplied the facial validity standard.[120] The defendants argue that, under Delaware law, bylaws are presumed valid, and the burden is on the plaintiff to demonstrate that they "'cannot operate lawfully or equitably under any circumstances.'"[121] As such, the court erred when it invalidated four of the Amended Bylaws by applying enhanced scrutiny. And third, they argue that the court erred by finding that four provisions of the Amended Bylaws failed enhanced scrutiny review because they are all proportional to the threat of an uninformed stockholder vote.[122]

On appeal, we accept the court's factual findings if they are "sufficiently supported by the record and are the product of an orderly and logical deductive

---

[117] Answering Br. at 6.

[118] *Id.* at 27.

[119] *Id.*

[120] *Id.* at 30.

[121] *Id.* (quoting *Salzberg v. Sciabacucchi*, 227 A.3d 102, 113 (Del. 2020)).

[122] *Id.* at 34–40.

30

process."[123]  Only when they are "clearly wrong and the doing of justice requires their overturn" are we "free to make contradictory findings of fact."[124]  We review *de novo* the court's legal conclusions.[125]  We review the results of the court's enhanced scrutiny analysis and interpretation of corporate bylaws *de novo*.[126]

## II.

The DGCL is broadly enabling and offers "immense freedom for businesses to adopt the most appropriate terms for the organization, finance, and governance of their enterprise."[127]  Consistent with this legislative choice, the DGCL places minimal procedural and substantive requirements on stockholders and directors when addressing bylaws.[128]  As a matter of procedure, stockholders have the "power to adopt, amend or repeal bylaws,"[129] and directors may do so if authorized by the

---

[123] *Levitt v. Bouvier*, 287 A.2d 671, 673 (Del. 1972).

[124] *Id.*

[125] *Coster*, 300 A.3d at 663.

[126] *Id.*; *Airgas, Inc. v. Air Prod. & Chemicals, Inc.*, 8 A.3d 1182, 1188 (Del. 2010).

[127] *Salzberg*, 227 A.3d at 116.

[128] *See* 8 *Del. C.* § 211(b) ("Unless directors are elected by written consent in lieu of an annual meeting as permitted by this subsection, an annual meeting of stockholders shall be held for the election of directors on a date and at a time designated by or in the manner provided in the bylaws."); *id.* § 211(e) ("All elections of directors shall be by written ballot unless otherwise provided in the certificate of incorporation; if authorized by the board of directors . . . .").

[129] 8 *Del. C.* § 109(a).  This power must be read with Section 141(a) of the DGCL.  *CA, Inc. v. AFSCME Emps. Pension Plan*, 953 A.2d 227, 232 (Del. 2008) ("[T]he shareholders' statutory power to adopt, amend or repeal bylaws is not coextensive with the board's concurrent power and is limited by the board's management prerogatives under Section 141(a).").

certificate of incorporation.[130]  As a matter of substance, bylaws "may contain any provision, not inconsistent with law or with the certificate of incorporation, relating to the business of the corporation, the conduct of its affairs, and its rights or powers or the rights or powers of its stockholders, directors, officers or employees."[131]

Advance notice bylaws require stockholders to provide the board with prior notice of, and information about, their director nominations.  They are "designed and function to permit orderly meetings and election contests and to provide fair warning to the corporation so that it may have sufficient time to respond to shareholder nominations."[132]  Advance notice bylaws assist the board's "information-gathering and disclosure functions, allowing boards of directors to knowledgeably make recommendations about nominees and ensuring that stockholders cast well-informed

---

[130] 8 *Del. C.* § 109(a) ("[A]ny corporation may, in its certificate of incorporation, confer the power to adopt, amend or repeal bylaws upon the directors . . . .").  As a result of Section 109's enabling language, stockholders, through the certificate of incorporation, may "assent to not having to assent to board-adopted bylaws."  *Boilermakers Loc. 154 Ret. Fund & Key W. Police & Fire Pension Fund v. Chevron Corp.*, 73 A.3d 934, 956 (Del. Ch. 2013) (citing *CA*, 953 A.2d at 231). Regardless of the authority vested in the board, stockholders retain the power to adopt and amend bylaws and may repeal bylaws adopted by the board.  *Id.*

[131] 8 *Del. C.* § 109(b).

[132] *Openwave Sys. Inc. v. Harbinger Cap. Partners Master Fund I, Ltd.*, 924 A.2d 228, 239 (Del. Ch. 2007).

votes."[133] They have evolved over time to meet changing market conditions and to adjust to evolving federal securities regulations.[134]

## A.

Under Delaware law, bylaws are "presumed to be valid" and must be interpreted "in a manner consistent with the law."[135] A facially valid bylaw is one that is "authorized by the Delaware General Corporation Law (DGCL), consistent with the corporation's certificate of incorporation, and not otherwise prohibited."[136] When a bylaw is challenged in court, it is insufficient for a plaintiff to simply assert that "under some circumstances, a bylaw might conflict with a statute, or operate

---

[133] *Paragon Techs., Inc. v. Cryan*, 2023 WL 8269200, at *7 (Del. Ch. Nov. 30, 2023) (internal quotation marks omitted).

[134] Early advance notice bylaws required advance notice of the nomination accompanied by basic information. Donald F. Parsons & Jason S. Tyler, *Activist Stockholders, Corporate Governance Challenges, and Delaware Law*, RESEARCH HANDBOOK ON MERGERS AND ACQUISITIONS 7 n.13 (Claire A. Hill & Steven Davidoff Solomon eds., 2016). Over time, bylaws imposed more onerous disclosure requirements about the stockholder nominator and nominees. *Id.* The information sought typically related to the nominator's financial positions with respect to the company, such as any derivative positions held, and the identities of persons acting in concert with the nomination group. *Id.* Until recently, dissident stockholders had a separate proxy card, meaning stockholders could only vote between competing slates. In 2021, the SEC adopted Rule 14a-19, which mandated a single universal proxy card. It allowed stockholders to pick directors from both the incumbent and rival slates from the same card. 17 CFR § 240.14a-19. The universal proxy rules prompted further evolution of advance notice bylaws to better conform to the rules. Aaron Wendt & Krishna Shah, *2023 Proxy Season Briefing: Key Trends and Data Highlights*, Harvard Law School Forum on Corporate Governance (Aug. 17, 2023), https://corpgov.law.harvard.edu/2023/08/17/2023-proxy-season-briefing-key-trends-and-data-highlight/ ("More than 685 companies in our coverage amended advance notice bylaws in response to universal proxy[.]").

[135] *Frantz Mfg. Co. v. EAC Indus.*, 501 A.2d 401, 407 (Del. 1985).

[136] *ATP*, 91 A.3d at 557–58.

unlawfully."[137]  Instead, the plaintiff must demonstrate that the bylaw cannot operate lawfully under any set of circumstances.[138]

B.

Even if facial validity is not at issue, bylaws are still subject to judicial review. If the court has before it a "genuine, extant controversy" involving the adoption, amendment, or application of bylaws, the Court of Chancery reviews corporate acts not only for their legality but also for their equity.[139]  The General Assembly's "capacious grant of power is policed in large part by the common law of equity, in the form of fiduciary duty principles."[140]  As we have repeated time and again since

---

[137] *Id.*

[138] *Id*.  *See also Salzberg*, 227 A.3d at 113 ("[T]he plaintiff must show that the charter provisions 'cannot operate lawfully or equitably under any circumstances.'  Plaintiffs must demonstrate that the charter provisions 'do not address proper subject matters' as defined by statute, 'and can never operate consistently with law.'" (quoting *Cedarview Opportunities Master Fund, L.P. v. Spanish Broad. Sys., Inc*., 2018 WL 4057012, at *20 (Del. Ch. Aug. 27, 2018); *Boilermakers*, 73 A.3d at 949)).

[139] *Boilermakers*, 73 A.3d at 949 ("Thus, a plaintiff can challenge the real-world enforcement of a forum selection bylaw.  But that review happens when there is a genuine, extant controversy in which the forum selection bylaw is being applied.").  A court should only hear bylaw adoption, amendment, and application claims that are "ripe for judicial determination." *Stroud v. Milliken Enterprises, Inc*., 552 A.2d 476, 480 (Del. 1989).  A bylaw dispute is ripe when litigation is "unavoidable" and the "material facts are static."  *Id.* at 481 (citing *Stabler v. Ramsay*, 88 A.2d 546, 550 (Del. 1952); *Rollins Int'l, Inc. v. Int'l Hydronics Corp*., 303 A.2d 660, 662 (Del. 1973)). Fiduciary review standards are meant to address "real-world concerns when they arise in real-world and extant disputes, rather than hypothetical and imagined future ones." *Boilermakers*, 73 A.3d at 963.  Here, the AIM board amended its bylaws during a prolonged proxy contest with dissidents, and ultimately used those bylaws to keep the insurgents off the ballot.  The defendants have not argued that the dispute is premature for adjudication.

[140] *Hollinger*, 844 A.2d at 1078.

34

our 1971 decision in *Schnell v. Chris-Craft Industries, Inc.*, "inequitable action does not become permissible simply because it is legally possible."[141] In other words, when corporate action is challenged, it must be twice-tested – first for legal authorization, and second by equity.[142] The same principles apply to board-adopted advance notice bylaws.

Delaware courts scrutinize closely corporate acts that affect stockholder voting. As Chancellor Allen famously stated in *Blasius Industries, Inc. v. Atlas Corp.*, "[t]he shareholder franchise is the ideological underpinning upon which the legitimacy of directorial power rests."[143] Advance notice bylaws can be misused to thwart stockholder choice and entrench the existing board of directors. To pass judicial review, bylaws must, as a matter of equity, "be reasonable in their application" and not unfairly interfere with stockholder voting.[144]

---

[141] 285 A.2d 437, 439 (Del. 1971).

[142] *See In re Invs. Bancorp, Inc. S'holder Litig.*, 177 A.3d 1208, 1222 (Del. 2017) ("[D]irectors' exercise of [their] authority must be done consistent with their fiduciary duties."); *Hollinger*, 844 A.2d at 1077–78 ("In general, there are two types of corporate law claims. The first is a legal claim, grounded in the argument that corporate action is improper because it violates a statute, the certificate of incorporation, a bylaw or other governing instrument, such as a contract. The second is an equitable claim, founded on the premise that the directors or officers have breached an equitable duty that they owe to the corporation and its stockholders.").

[143] 564 A.2d 651, 659 (Del. Ch. 1988).

[144] *Frantz*, 501 A.2d at 407 (citing *Schnell*, 285 A.2d at 407); *Hubbard v. Hollywood Park Realty Enterprises*, Inc., 1991 WL 3151, at *11 (Del. Ch. Jan. 14, 1991) (holding that an advance notice bylaw must "afford the shareholders a fair opportunity to nominate candidates").

## C.

In *Coster v. UIP Companies, Inc.*, we folded *Schnell* and *Blasius* review into *Unocal* enhanced scrutiny review when a board interferes with a corporate election or a stockholder's voting rights in contests for control.[145] If a board adopts, amends, or enforces advance notice bylaws during a proxy context, *Coster* requires a two-part analysis. As explained in *Coster*, for the first step:

> the court should review whether the board faced a threat "to an important corporate interest or to the achievement of a significant corporate benefit." The threat must be real and not pretextual, and the board's motivations must be proper and not selfish or disloyal. As Chancellor Allen stated long ago, the threat cannot be justified on the grounds that the board knows what is in the best interests of the stockholders.[146]

---

[145] 300 A.3d at 672 (citing *Unocal Corp. v. Mesa Petroleum Co.*, 493 A.2d 946 (Del. 1985)). Prior to our decision in *Coster*, there was debate in the Court of Chancery over whether *Blasius*' "compelling justification" standard should function as an independent standard of review from enhanced scrutiny review. *See, e.g.*, *Mercier v. Inter-Tel (Delaware), Inc.*, 929 A.2d 786, 788 (Del. Ch. 2007) (stating that, rather than functioning as a standard of review, *Blasius* was more an "an after-the-fact label placed on a result"); *Chesapeake Corp. v. Shore*, 771 A.2d 293, 323 (Del. Ch. 2000) ("Given this interrelationship and the continued vitality of *Schnell v. Chris–Craft*, one might reasonably question to what extent the *Blasius* 'compelling justification' standard of review is necessary as a lens independent of or to be used within the *Unocal* frame."). *Blasius* is now subsumed in enhanced scrutiny review. 300 A.3d at 672.

[146] 300 A.3d at 672 (quoting *Phillips v. Insituform of N. Am., Inc.*, 1987 WL 16285, at *7 (Del. Ch. Aug. 27, 1987)). "When *Unocal* is applied in this context, it can 'subsume[ ] the question of loyalty that pervades all fiduciary duty cases, which is whether the directors have acted for proper reasons' and 'thus address[ ] issues of good faith such as were at stake in *Schnell*.'" *Id.* (alterations in original) (quoting *Mercier*, 929 A.2d at 807).

36

If the board adopted advance notice bylaws for a selfish or disloyal motive –

meaning for the primary purpose of precluding a challenge to its control – the

remedy is to declare the advance notice bylaws inequitable and unenforceable.[147]

Second, if the board's actions pass muster under the first step of enhanced

scrutiny review, then the court considers:

> whether the board's response to the threat was reasonable in relation
> to the threat posed and was not preclusive or coercive to the
> stockholder franchise. To guard against unwarranted interference
> with corporate elections or stockholder votes in contests for
> corporate control, a board that is properly motivated and has
> identified a legitimate threat must tailor its response to only what is
> necessary to counter the threat. The board's response to the threat
> cannot deprive the stockholders of a vote or coerce the stockholders
> to vote a particular way.[148]

---

[147] *Schnell*, 285 A.2d at 437; *see Frantz*, 501 A.2d at 407 ("*Schnell* prohibits incumbent management from entrenching itself by taking action which, though legally possible, is inequitable."). *MM Companies, Inc. v. Liquid Audio, Inc.*, 813 A.2d 1118, 1132 (Del. 2003) (citing *Schnell*, 285 A.2d at 439) (holding that a bylaw amendment expanding the board's size was intended to interfere with the stockholder franchise, invalidating the appointment of new board members, thereby rendering the expansion bylaw unenforceable); *AB Value Partners, LP v. Kreisler Mfg. Corp.*, 2014 WL 7150465, at *5 (Del. Ch. Dec. 16, 2014) (holding that "[p]laintiff must provide compelling facts indicating that enforcement of the [advance notice bylaw] is inequitable" to enjoin application of an otherwise valid bylaw under *Schnell*); *Hollinger*, 844 A.2d at 1081 (finding bylaw amendments implemented by controller to facilitate a favored transaction and neutralize board's opposition "were clearly adopted for an inequitable purpose and have an inequitable effect"); *Hubbard*, 1991 WL 3151, at *13 (ordering waiver of an advance notice bylaw to allow shareholders to nominate an opposing director slate in response to a material change in company policy instituted after nomination deadline); *Lerman v. Diagnostic Data, Inc.*, 421 A.2d 906, 914 (Del. Ch. 1980) (holding that a 70-days' notice bylaw was inequitable in a situation where the board announced the annual meeting only 63 days before it was to occur, rendering compliance impossible); *Linton v. Everett*, 1997 WL 441189, at *10 (Del. Ch. July 31, 1997) ("[D]irectors' decision to provide only thirty days' notice, which would inevitably trigger the advance notice provision in a manner foreseeably adverse to any shareholders desiring to nominate an opposing slate, constituted an inequitable manipulation of the election process.").

[148] *Coster*, 300 A.3d at 672 (citing *Blasius*, 564 A.2d at 656).

37

Enhanced scrutiny review ensures that a board's actions are sufficiently tailored to the threat at hand such that the act does not unfairly impede the free exercise of the stockholder franchise.[149] If a board is motivated to counter a legitimate threat, but its response is disproportionate, the Court of Chancery has the discretion to impose an equitable remedy.[150] In the context of advance notice bylaws, if the bylaws were adopted for a proper purpose but some of the advance notice provisions were disproportionate to the threat posed and preclusive, the Court of Chancery has the discretion to decide whether to enforce, in whole or in part, the bylaws that can be applied equitably.[151]

---

[149] *Id.* ("*Unocal* can also be applied with the sensitivity *Blasius* review brings to protect the fundamental interests at stake – the free exercise of the stockholder vote as an essential element of corporate democracy.").

[150] Following proportionality review, the Court of Chancery "has broad power to fashion an equitable remedy." *Unitrin, Inc. v. Am. Gen. Corp.*, 651 A.2d 1361, 1391 (Del. 1995); *see also Gotham Partners, L.P. v. Hallwood Realty Partners, L.P.*, 817 A.2d 160, 176 (Del. 2002) ("[T]he Court of Chancery's 'powers are complete to fashion any form of equitable and monetary relief as may be appropriate.'" (quoting *Weinberger v. UOP, Inc.*, 457 A.2d 701, 714 (Del. 1983))).

[151] Kellner relies on *Unitrin* to argue that all defensive actions by a board must stand and fall together. In *Unitrin*, we held that when defensive actions are "inextricably related," they should be "scrutinized collectively" under the proportionality prong of *Unocal*. 651 A.2d at 1387. *Unitrin*'s relatedness language refers to the method of analysis, not a limitation on what relief is available. *Id.* at 1391. As noted in the current case, it may be necessary to assess how bylaws work together, but one problematic bylaw does not invalidate others when the board has a proper motive. Overbroad invalidation would be extreme and unnecessary when the board acted with proper motive to protect a legitimate corporate interest. *Kellner*, 307 A.3d at 1037 & n.331. *Unitrin* does not require an all-or-nothing approach to relief but rather stresses that defensive actions should be assessed "individually and collectively." 651 A.2d at 1390. Just as the Court of Chancery will not endorse a tripwire against an activist stockholder, it should not endorse a reverse tripwire by the activist. *See also Mentor Graphics Corp. v. Quickturn Design Sys., Inc.,* 728 A.2d 25, 44 & n.47 (Del. Ch.), *aff'd sub nom. Quickturn Design Sys., Inc. v. Shapiro*, 721 A.2d 1281 (Del. 1998) (after determining that there was no dispute as to motive, that under enhanced scrutiny,

38

The *Coster* two-part enhanced scrutiny review – first, discerning a threat and board motive, and second, determining whether the board's actions were proportionate to the threat posed and not preclusive or coercive – is meant to balance the legitimate concerns of the board to respond to real threats with the equally legitimate concern of allowing fully-informed stockholders to have the final say. As stated in *Unocal*:

> The restriction placed upon a [defensive measure] is that the directors may not have acted solely or primarily out of a desire to perpetuate themselves in office. Of course, to this is added the further caveat that inequitable action may not be taken under the guise of law. *Schnell v. Chris-Craft Industries, Inc.*, Del.Supr., 285 A.2d 437, 439 (1971). The standard of proof . . . is designed to ensure that a defensive measure to thwart or impede a takeover is indeed motivated by a good faith concern for the welfare of the corporation and its stockholders, which in all circumstances must be free of any fraud or other misconduct. . . . However, this does not end the inquiry. A further aspect is the element of balance. If a defensive measure is to come within the ambit of the business judgment rule, it must be reasonable in relation to the threat posed.[152]

## III.

In this appeal, it is apparent that confusion existed in the Court of Chancery between a "validity" challenge and an "enforceability" challenge. Some of that

---

the court held that a bylaw amendment could operate equitably, but not a redemption plan); *QVC Network, Inc. v. Paramount Commc'ns Inc.*, 635 A.2d 1245, 1271 (Del. Ch.), *aff'd and remanded*, 637 A.2d 828 (Del. 1993) (enjoining most, but not all defensive measures taken by the board in responding to a corporate takeover).

[152] 493 A.2d at 955 (citations omitted).

39

confusion might be attributed to how courts, including this Court, have used different words or expressions to describe the outcome of a successful bylaw challenge.[153] The Court of Chancery understood that Kellner "argue[d] that the Amended Bylaws are invalid," and assessed whether the Amended Bylaws were "facially valid."[154] But instead of undertaking a facial validity analysis, the court employed enhanced scrutiny review to declare four of six Amended Bylaws invalid. The court relied on

---

[153] The confusion stems from the use of different words or expressions like invalid, void, inequitable, unenforceable, nullified, struck down, and no force and effect. The choice of words has been imprecise regarding the "thorny area" of voidness. *Holifield v. XRI Inv. Holdings LLC*, 304 A.3d 896, 930 (Del. 2023). For example, in *Hollinger*, the Court of Chancery referred to bylaw amendments as being "inequitable," "ineffective," "of no force and effect," and "struck down." 844 A.2d 1022. This Court in *Frantz* equated "strik[ing] down" a bylaw with rendering it "void." 501 A.2d at 407. Other decisions have described the exercise of the board's authority under a facially valid but inequitable bylaw as being "nullif[ied]," "invalid," and "not being permitted to stand." *Schnell*, 285 A.2d at 440 (nullifying the change in a meeting date for a stockholder vote, under a legal bylaw); *Liquid Audio*, 813 A.2d at 1132 (invalidating a board expansion carried out under a valid bylaw). As described above, a facially valid bylaw must be consistent with the DGCL, the certificate of incorporation, and not otherwise prohibited by law. 8 *Del. C.* § 109(b). An invalid bylaw is *ab initio* void. *See Michelson v. Duncan*, 407 A.2d 211, 218–19 (Del. 1979) ("The essential distinction between voidable and void acts is that the former are those which may be found to have been performed in the interest of the corporation but beyond the authority of management, as distinguished from acts which are *ultra vires* . . . ."). A valid bylaw, when inequitable, is rendered unenforceable. *See, e.g.*, *Hollinger*, 844 A.2d 1022; *Hubbard*, 1991 WL 3151, at *13 (enjoining the board's use of a valid bylaw after conducting review under *Blasius* and *Schnell*). *See also Liquid Audio*, 813 A.2d at 1132 ("At issue in this case is not the validity generally of either a bylaw that permits a board of directors to expand the size of its membership or a board's power to appoint successor members to fill board vacancies. In this case, however, the incumbent board timed its utilization of these otherwise valid powers to expand the size and composition of the Liquid Audio board for the primary purpose of impeding and interfering with the efforts of the stockholders' power to effectively exercise their voting rights in a contested election for directors.").

[154] *Kellner*, 307 A.3d at 1021.

several hypothetical scenarios where the bylaws would be patently unreasonable if applied in that fashion.[155]

When a validity challenge is raised, as might have been the case here, the court should undertake an analysis distinct from enhanced scrutiny review.[156] As explained earlier, to assess validity, the court reviews whether the bylaw is contrary to law or the certificate of incorporation and addresses a proper subject matter.[157] A bylaw is presumed valid, and the court should not consider hypotheticals or speculate whether the bylaw might be invalid under certain circumstances. Instead, the burden is on the party asserting invalidity to demonstrate that the bylaw cannot be valid under any circumstance.[158]

Here, with one exception, we have no trouble concluding that the Amended Bylaws are valid. As explained earlier, under the DGCL, and as provided in AIM's

---

[155] *Id.* at 1027–35 (conducting a proportionality analysis of the AAU Provision, Consulting/Nominating Provision, Known Supporter Provision, and Ownership Provisions).

[156] We do not fault the Court of Chancery for the confusion. It appears that the parties were less than clear about the nature of their claims. Kellner argues that this Court has applied enhanced scrutiny to invalidate bylaws through "adoption" claims. Reply Br. at 34. In each of the decisions cited, the reviewing court either held the bylaw unenforceable, not invalid or void – or invalidated a corporate act which misused a valid bylaw. *Schnell*, 285 A.2d at 439–40; *Liquid Audio*, 813 A.2d at 1132; *Blasius*, 564 A.2d at 655 (invalidating an act, not a bylaw); *In re Williams Companies S'holder Litig.*, 2021 WL 754593, at *40 (Del. Ch. Feb. 26, 2021), *aff'd sub. nom. Williams Cos., Inc. v. Wolosky*, 264 A.3d 641 (Del. 2021) (TABLE) (holding an inequitable shareholder rights plan unenforceable).

[157] *ATP*, 91 A.3d at 558.

[158] *Id. See also Salzberg*, 227 A.3d at 113 (applying the same rule for charter provisions).

41

certificate of incorporation, the directors have the "power to adopt, amend or repeal bylaws."[159]  Kellner has not argued that the AIM board lacked such power.  And AIM's bylaws "may contain any provision, not inconsistent with law or with the certificate of incorporation, relating to the business of the corporation, the conduct of its affairs, and its rights or powers or the rights or powers of its stockholders, directors, officers or employees."[160]  Kellner has not argued that the Amended Bylaws are outside the broad subject matter permitted by the General Assembly. With one exception, the Amended Bylaws are valid.

The one exception is the Ownership Provision.  The Court of Chancery concluded that the 1,099-word single-sentence provision was "indecipherable."[161] We agree.  The bylaw, with its thirteen discrete parts, is excessively long, contains vague terms, and imposes virtually endless requirements on a stockholder seeking to nominate directors.[162]  AIM's chairman stated "that the bylaw was written in such

---

[159] 8 *Del. C.* § 109(a).

[160] *Id.* § 109(b).

[161] *Kellner*, 307 A.3d at 1034 ("Though I have tried to read and understand it, the bylaw—with its 1,099 words and 13 subparts—is indecipherable.").

[162] The defendants do not meaningfully defend the structure or drafting of the bylaw, only its subject matter.  Answering Br. at 39.  The court considered the subject matter of the bylaw and concluded that "[a]ny justifiable objectives that might be served by aspects of the Ownership Provision are buried under dozens of dense layers of text." *Kellner*, 307 A.3d at 1035.

a way that "no one would read it."[163]  As he testified, if the directors had started reading it "line by line" during their March 2023 board meeting, they "would still be in the meeting."[164]  An unintelligible bylaw is invalid under "any circumstances."[165]

## IV.

The Court of Chancery found that, before amending AIM's bylaws, the board "had an objective of obtaining transparency from a stockholder seeking to nominate director candidates."[166]  The court also found that the AIM board made a reasonable assessment that its current advance notice bylaws were insufficient to prevent a repeat of the manipulative, misleading, and improper conduct in the 2022 nomination process.[167]

Given the insurgents' troubling history, we agree with the Court of Chancery that there was a threat to the board's information-gathering function, and that the

---

[163] *Kellner*, 307 A.3d at 1034 (quoting the record).

[164] *Id.* (quoting the record).

[165] The defendants argue that Kellner did not "bring a facial relief claim" and therefore the Court of Chancery should not have invalidated any of the bylaws.  Answering Br. at 30.  As Kellner points out, he challenged the Amended Bylaws' adoption, and with respect to the Ownership Provision, he correctly argued that "it fails any and every standard of review."  Reply Br. at 35, 45.  In any case, the defendants put the issue before the court when they sought a declaration that the bylaws are "valid and lawful."  Dfs.' Ans. Ver. Compl. and Ver. CC. at 100.

[166] *Kellner*, 307 A.3d at 1026.

[167] *Id.*

AIM board identified an important corporate objective in amending its bylaws – transparency in board elections. The court also found, however, that the AIM board likely acted with an improper purpose when adopting the Amended Bylaws that, unsurprisingly, were used to reject Kellner's nomination, most notably the AAU Provision.

Of the six Amended Bylaws that are the focus of this appeal, one was nonsensical and therefore invalid. According to the Court of Chancery, the invalid bylaw "seem[ed] designed to preclude a proxy contest for no good reason; none were given."[168] The court also found that, in essence, the AIM board acted inequitably when it adopted the three remaining Amended Bylaws. It observed that the bylaws "suggest[ed] an intention to block the dissident's effort,"[169] were "akin to a tripwire,"[170] could be "draconian,"[171] and "exceed[ed] any reasonable approach to ensuring thorough disclosure."[172] The court concluded that, when the AIM board adopted various advance notice provisions in the Amended Bylaws, their actions

---

[168] *Id.* at 1034–35.

[169] *Id.* at 1031.

[170] *Id.* at 1030.

[171] *Id.* at 1031.

[172] *Id.* at 1032.

"seem[ed] designed to thwart an approaching proxy contest, entrench the incumbents, and remove any possibility of a contested election."[173]

We consider these findings dispositive on appeal to the enhanced scrutiny motive inquiry. As explained below, the Court of Chancery's assessment about the unreasonableness of a majority of the Amended Bylaws lead us to conclude that the AIM board amended its bylaws for an improper purpose – to thwart Kellner's proxy contest and maintain control.[174] The board's conduct fails the first prong of enhanced scrutiny review.

A.

The AAU Provision required the disclosure of all arrangements, agreements, or understandings, "whether written or oral, and including promises," relating to a board nomination.[175] The Court of Chancery found the SAP term unreasonable.[176] It noted that the "Holder" SAP definition included:

---

[173] *Id.* at 1036.

[174] We limit our ruling to the six Amended Bylaws on appeal. Other bylaws were amended for different purposes and were not challenged on appeal. As the court noted, "[c]ertain of the Amended Bylaws reflect changes to address Rule 14a-19 and cohere with the DGCL," and are unaffected by our decision. *Kellner*, 307 A.3d at 1025.

[175] A409.

[176] *Kellner*, 307 A.3d at 1030.

(i) any person acting in concert with such Holder with respect to the Stockholder Proposal or the Corporation, (ii) any person controlling, controlled by, or under common control with such Holder or any of their respective Affiliates and Associates, or a person acting in concert therewith with respect to the Stockholder Proposal or the Corporation, and (iii) any member of the immediate family of such Holder or an Affiliate or Associate of such Holder.[177]

The SAP provision, according to the court, created an ill-defined web of disclosure requirements through the interaction of terms such as "acting in concert," "Associate," "Affiliate," and "immediate family."[178]  The defendants argue on appeal that the AAU Provision is equitable because the board relied on counsel and had a legitimate objective in seeking multi-level relationships among the activists.[179] They contend that the AAU does not require knowledge the nominator does not know and could not obtain.[180]  We disagree.  As the Court of Chancery determined, the SAP term in the AAU Provision requires a nominator to disclose not only personal knowledge but also to take steps to gather information about agreements and understandings between any members of potentially limitless class of third parties and individuals unknown to the nominator.[181]

---

[177] A412.

[178] *Kellner*, 307 A.3d at 1030.

[179] Answering Br. at 37.

[180] *Id.* at 36.

[181] *Kellner*, 307 A.3d at 1030.

We agree with the Court of Chancery that the AAU Provision, as drafted, did not further the AIM board's stated purpose of preventing stockholders from misconstruing or evading the Amended Bylaws' disclosure requirements. Instead, it functioned as a "tripwire" rather than an information-gathering tool and "suggest[ed] an intention to block the dissidents' effort."[182]

## B.

Next, the court determined that the Consulting/Nomination Provision was unreasonable.[183] The provision required disclosure of AAUs spanning a ten-year window "between the nominating stockholder or an SAP, on one hand, and any stockholder nominee, on the other hand, regarding consulting, investment advice, or a previous nomination for a publicly traded company within the last ten years."[184] The court held that the bylaw suffers from the same SAP problem as the AAU Provision by imposing "ambiguous requirements," this time "across a lengthy term."[185]

---

[182] *Id.* at 1031. The court, after invalidating the AAU Provision, applied the 2016 AAU Provision to reject the notice. As we have determined, the AAU Provision is still valid, even if unenforceable, and thus a reversion to the 2016 bylaw is not possible.

[183] *Kellner*, 307 A.3d at 1031.

[184] *Id.* (citing A409).

[185] *Id.*

The court also held that the Provision was unreasonable because it sought AAUs involving other publicly traded companies over an onerous ten-year period and between and among a broadly defined set of third parties. The defendants argue that the court's reading is incorrect and that the provision only sought information involving the nominee.[186] We disagree. The provision requires the nominating stockholder to disclose, as to each nominee, AAUs between or among each nominator and/or any SAP, and the nominee.[187] This is not just a requirement to disclose AAUs involving the nominee, but also among the vague categories of SAPs and the nominee.

The defendants do not address the problematic lengthy ten-year term encompassing any public company. AIM's Chairman characterized the relevance of the information sought by the Provision as "arguable."[188] We agree with the Court of Chancery that the Provision imposed ambiguous requirements across a lengthy term; sought only marginally useful information; gave the board "license to reject a notice" based on a subjective interpretation of its imprecise terms; and, at worst, was "draconian."[189]

---

[186] Answering. Br. at 38.

[187] A409.

[188] *Kellner*, 307 A.3d at 1031(quoting the record).

[189] *Id.* at 1030.

48

C.

The Court of Chancery was also troubled by the unreasonableness of the Known Supporter Provision, which requires the nominator and nominees to list any person who acted in "support" of a stockholder proposal.[190] The defendants argue that this provision is similar in scope and purpose to a bylaw approved by the Court of Chancery in *Rosenbaum v. CytoDyn, Inc*.[191] The court observed that, unlike the *CytoDyn* bylaw, which only sought disclosure of known "financial support" from stockholders, the AIM provision operates more broadly and seeks disclosure of any support whatsoever from both stockholders and SAPs.[192]

The defendants point out that the bylaw in *CytoDyn* and the Known Supporter Provision use virtually identical language.[193] Even so, the court took issue with the use of the troubling SAP term in the bylaw, which rendered the bylaw's requirements

---

[190] *Id.* (citing A409).

[191] 2021 WL 4775140, at *19 (approving a bylaw that mandated disclosure of supporters).

[192] *Kellner*, 307 A.3d at 1032.

[193] *Compare CytoDyn*, 2021 WL 4775140, at *9 ("[I]dentification of the names and addresses of other stockholders (including beneficial owners) known by any of the Proposing Persons to support nominations or other business proposal(s), and to the extent known the class and number of all shares of the Corporations' capital stock owned beneficially or of record by such other stockholder(s) or other beneficial owner(s) . . . ."), *with Kellner*, 307 A.3d at 1031 n.306 ("the names (including, if known, the full legal names and any alias names used) and addresses of other stockholders (including beneficial owners) known by any Holder or Stockholder Associated Person to support such Stockholder Proposal or Stockholder Proposals (including, without limitation, any nominations), and to the extent known, the class or series and number of all shares of the Corporation's capital stock owned beneficially or of record by each such other stockholder or other beneficial owner.").

far more expansive than the one at issue in *CytoDyn*. Like the AAU Provision, the nominating stockholder must not only respond based on personal knowledge, but also an ill-defined daisy chain of persons. We agree with court's conclusion that the Known Supporter Provision "impedes the stockholder franchise while exceeding any reasonable approach to ensuring thorough disclosure."[194]

## D.

We have also described earlier the problematic nature of the Ownership Provision. As the court held, it is "unintelligible" and "seems designed to preclude a proxy contest for no good reason; none were given."[195] A stockholder "could not fairly be expected to comply."[196]

## V.

In the middle of a proxy contest, the AIM board adopted one unintelligible bylaw and three unreasonable bylaws. It then used the Amended Bylaws to reject Kellner's nomination notice. The Court of Chancery found that the Amended Bylaws "seem[ed] designed to thwart an approaching proxy contest, entrench the incumbents, and remove any possibility of a contested election."[197] It also observed

---

[194] *Kellner*, 307 A.3d at 1031.

[195] *Id.* at 1034–35.

[196] *Id.*

[197] *Id.* at 1036.

that the Amended Bylaws precluded stockholders, such as Kellner, from a "fair opportunity to nominate candidates."[198] The unreasonable demands of most of the Amended Bylaws show that the AIM board's motive was not to counter the threat of an uninformed vote. Rather, the board's primary purpose was to interfere with Kellner's nomination notice, reject his nominees, and maintain control. As the product of an improper motive and purpose, which constitutes a breach of the duty of loyalty, all the Amended Bylaws at issue in this appeal are inequitable and therefore unenforceable.[199]

We also note that, according to the Court of Chancery, Kellner submitted false and misleading responses to some of the requests.[200] Given the court's countervailing findings about Kellner's and his nominees' deceptive conduct, no further action is warranted. The judgment of the Court of Chancery is affirmed in part and reversed in part. The case is closed.

---

[198] *Id.* at 1036.

[199] *Kreisler Mfg. Corp.*, 2014 WL 7150465, at *5 ("The clearest set of cases providing support for enjoining an advance notice bylaw involves a scenario where a board, aware of an imminent proxy contest, imposes or applies an advance notice bylaw so as to make compliance impossible or extremely difficult, thereby thwarting the challenger entirely.").

[200] *Kellner*, 307 A.3d at 1039–40 & n.353 (finding that Kellner's AAU disclosures were "false" and "omitted and misrepresented meaningful AAUs," and that the 2022 AAU disclosures concealed Tudor's role in the nomination process); *Kellner v. AIM ImmunoTech Inc.*, 2024 WL 62666, at *2 (Del. Ch. Jan. 5, 2024) (Letter Op.) ("The resolution of that claim turned on factual findings that arrangements or understandings animating Kellner's nomination were obfuscated from AIM's board and stockholders. Kellner was required to disclose these arrangements or understandings. He did not.").