FRANTZ MANUFACTURING COMPA-
NY, H.B. Musgrove, B.W. Bivin, J.L.
Rutt, J.W. Collins, and C.R. Bickel, De-
fendants Below, Appellants,

v.

EAC INDUSTRIES, Plaintiff
Below, Appellee.

Supreme Court of Delaware.
Submitted: Aug. 19, 1985.
Decided: Aug. 19, 1985.
Opinion Released: Dec. 5, 1985.

Lewis S. Black, Jr., and Paul P. Welsh (argued), of Morris, Nichols, Arsht & Tunnell, Wilmington, and Theodore W. Grippo, James A. Klenk, Barry Ginsberg and Margaret S. Determan, of Reuben & Proctor, Chicago, Ill., of counsel, for defendants below-appellants.

Allen M. Terrell, Jr., Wendell Fenton and Samuel A. Nolen, of Richards, Layton & Finger, Wilmington, and Harold C. Wheeler (argued), Robert F. Wall and James Vroman, of Winston & Strawn, Chicago, Ill., for plaintiff below-appellee.

Before CHRISTIE, C.J., McNEILLY and MOORE, JJ.

CHRISTIE, Chief Justice:

The issues in this case focus on the fiduciary duties of the boards of directors of both a target corporation, Frantz Manufacturing Company ("Frantz"), and an acquiring corporation, EAC Industries ("EAC"), after the acquirer has taken control of the target corporation by use of the shareholder consent procedure of 8 *Del.C.* § 228.[1]

EAC sought a preliminary injunction in the Court of Chancery to nullify the actions taken by the Frantz board to regain control of the corporation. The Frantz board had tried to dilute EAC's newly acquired control of 51% of the voting stock of Frantz after EAC had taken steps to assert its control of Frantz. To do this, the Frantz board had transferred 125,000 of its treasury shares to an Employee Stock Ownership Plan ("ESOP") four days after EAC had tendered shareholder consents to Frantz, pursuant to 8 *Del.C.* § 228, by which EAC had altered the Frantz bylaws and placed EAC's president on Frantz' board of directors. The amendments to the

---

**1.** 8 *Del.C.* § 228(a) states in pertinent part:

Unless otherwise provided in the certificate of incorporation, any action required by this chapter to be taken at any annual or special meeting of stockholders of a corporation, or any action which may be taken at any annual or special meeting of such stockholders, may be taken without a meeting, without prior notice and without a vote, if a consent in writing, setting forth the action so taken, shall be signed by the holders of outstanding stock having not less than the minimum number of votes that would be necessary to authorize or take such action at a meeting at which all shares entitled to vote thereon were present and voted.

Frantz bylaws required, among other things, that all directors be present for a quorum at a board meeting and that a unanimous vote of directors is necessary for all action taken by the board and its committees.

In the Court of Chancery, EAC sought a declaration that the shareholder consents amending the Frantz bylaws were legally effective, and that the subsequent reaction of Frantz management in attempting to deprive EAC of control of Frantz by issuing stock to others was ineffective. Frantz counterclaimed and sought a determination that EAC's bylaw amendments were invalid because the ESOP had been properly created and funded, and the stock issued to the ESOP diluted EAC's purported control of Frantz.

The Court of Chancery concluded that the injunction should issue because the actions of the Frantz board to regain control of the corporation were: (a) not informed, (b) a retrospective defensive maneuver not protected under the business judgment rule, and (c) inequitable conduct undertaken to entrench Frantz management. Frantz then sought review in this Court.

On August 19, 1985, we affirmed the order of the Court of Chancery and found that the EAC consents effectively changed the Frantz bylaws and declared the dilution of EAC's controlling stock ownership by Frantz' funding of an ESOP to be void. This opinion constitutes a further explanation of the rulings announced.

I.

First, we address whether EAC's bylaw amendments adopted by shareholder consents were valid under the circumstances. Next, we consider whether the ESOP could

be funded in response to a shift in majority ownership of the shares of a corporation without the consent of the new majority which had already asserted control of the corporation by amendments to the bylaws. Finally, we consider whether a director breached his fiduciary duty to the target corporation (Frantz) and its shareholders when he tendered his resignation as a director at the same time he sold his shares to the acquiring corporation (EAC).

II.

Frantz is a small manufacturing company with more than $7 million in cash reserves. Although Frantz' shares are publicly traded on the American Stock Exchange, prior to recent events it had only about 700 stockholders, and most of its stock was held by the corporation's founding families or in trust for those families. Prior to April 17, 1985, the board was composed of six directors serving staggered terms. All but one of the directors were closely related to the Frantz corporation.[2]

The struggle for control of Frantz began in the spring of 1984 when Snyder, McAlaine & Castle ("SMC"), a Philadelphia-based investment firm, sought to acquire a position in Frantz stock. By May, 1984, SMC held 6.9% of the outstanding shares. In the following months, SMC discussed the possibility of taking Frantz private through a leveraged buyout with the Frantz management.

Negotiations between Frantz and SMC were unsuccessful, however, and Frantz management began to explore the feasibility of taking the company private without SMC. One option for taking the company private involved establishing an Employee Stock Ownership Plan ("ESOP")

---

**2.** Thomas Rosenow, the chairman of the board, was the former president of the company. H. Barrett Musgrove was the current president and chief executive officer. James W. Collins was a partner in the law firm retained by Frantz. Bernard U. Bivin and John H. Rutt were former long-time employees of Frantz. Charles R. Bickel was a bank officer in Frantz' principal place of business.

Thomas Rosenow's health was impaired by a series of strokes which limited his speech, memory, and ability to read. Because of his failing health, Mr. Rosenow retired on March 31, 1985. The Board's minutes of February 22, 1985 reflect that the Board was well aware of Rosenow's condition and imminent retirement.

which would hold 100,000 shares of Frantz stock.

When Frantz began formulating a management-sponsored leveraged buyout, there were approximately 771,902 Frantz shares outstanding, with an additional 285,674 shares held in the company treasury. The largest single block of shares was held in trust and controlled by the Northern Trust Company of Chicago ("Northern") for the benefit of the Wyne family. In addition, the Wyne Foundation, a family trust controlled by Thomas Rosenow and his wife, controlled 44,000 shares.

Musgrove, Frantz' president and chief executive officer, began discussions with Northern in an attempt to acquire the Northern holdings, along with the shares of SMC, the Rosenows, and the Wyne Foundation. The shares to be issued to the ESOP were important to Frantz' plan to take the company private because Frantz without them would be short of a majority after acquiring the shares held by Northern, SMC, the Wyne Foundation, and Rosenow.

In the summer of 1984, Musgrove prepared several documents which analyzed some of the financial considerations for taking the company private. At the Frantz board meeting on August 17, 1984, Musgrove presented his proposals for a management-led leveraged buyout. The board discussed the mechanics of taking the company private and some specific features of the proposed ESOP. The board began to consider having the company purchase 339,000 shares held by Northern, SMC, the Wyne Foundation, and Rosenow and establishing an ESOP with 100,000 of these shares. The board authorized James Collins, the company's lawyer and a member of the board, to begin drafting the necessary documents to create an ESOP and to locate an investment firm to do a valuation of the company's stock. For this valuation, Frantz retained the investment banking firm of Bacon, Stifel, and Nicholas ("Bacon, Stifel").

Between October, 1984, and February, 1985, Frantz attempted to acquire the shares of Northern and SMC, but the offers were rejected. In early February, 1985, Northern and SMC agreed among themselves to vote and sell their Frantz stock together so that they could both get the highest price possible for their shares. Prior to a Frantz Board Meeting on February 22, 1985, SMC informed Musgrove of the arrangement between SMC and Northern. Thus, at that time about 44%, including the Rosenow and Wyne Foundation shares, of the company's issued and outstanding stock was for sale to the highest bidder.

In preparation for the February 22 board meeting, Musgrove asked the company treasurer, John McCormick, to prepare financial projections of the impact on the company's book value per share and earnings per share of purchasing 339,000 shares of Frantz stock under two different plans. The first plan assumed that Frantz would purchase the stock at $40 per share and retire the shares to the company treasury. The second plan assumed that Frantz and an ESOP would purchase the blocks of stock together, with the ESOP acquiring 100,000 shares, and Frantz retiring 239,000 shares. No analysis was prepared considering Frantz selling treasury shares to an ESOP in a stand-alone transaction.

At the February 22 meeting, the board of directors discussed possible sources of funding for a tender offer and leveraged buyout. The board discussed McCormick's financial projections in two plans for taking the company private and considered funding an ESOP with previously issued and outstanding stock which would be purchased from Northern. The board may have discussed funding an ESOP with treasury stock or authorized but unissued stock, but this source of funding had not been part of any analysis presented to the board. Since Musgrove and Collins had determined that the proposed ESOP would receive IRS clearance without shareholder

approval, the board passed a resolution directing the officers to set up an ESOP without requiring shareholder approval.[3]

Between the February 22 board meeting and the next scheduled meeting in mid-April, Musgrove and McCormick set up financing for purchasing shares for the ESOP. Because of favorable tax treatment of interest paid on ESOP loans, the loan commitments sought involved direct loans of $4.5 million to the ESOP, guaranteed by Frantz, with interest rates at 80 to 89% of prime. Frantz received commitments for the necessary loans.

By this time, EAC, a diversified manufacturer of hardware and aircraft products, had begun its quest for control of Frantz. EAC had been contacted by SMC in its efforts to sell the SMC block of Frantz stock and in January 1985, EAC began confidential negotiations with the holders of all of the large blocks of Frantz stock. Between February 12 and April 8, 1985, EAC made market purchases of 17,665 shares (about 2.3% of the outstanding shares of Frantz) in street name. Eventually, Northern was brought into the negotiations with EAC, and through Northern, Rosenow's shares and the shares held by the Wyne Trust were considered for the EAC purchase plan.

After weeks of negotiations, EAC reached an agreement with SMC, Northern, Rosenow, and the Wyne Trust to purchase all of their shares. Because EAC was already highly leveraged, it had difficulty in arranging financing for the purchase of these shares, but by April 15, 1985, EAC was able to secure financing.

Two days later, EAC simultaneously bought the SMC, Northern, Rosenow, and Wyne Trust stock. EAC also purchased a block of shares from Pioneer III, Inc. to accumulate approximately 51% of Frantz' outstanding shares.[4] On April 18, 1985, EAC's president (Peter Fritzsche) traveled to Frantz' headquarters to assert control through shareholder consents from the owners of 51% of the stock. In addition, Fritzsche presented Rosenow's resignation from the Frantz board and was elected to the Frantz board by the shareholder consents.

The consents also made changes in the bylaws which required: (a) all directors to be present for a quorum; (b) unanimous vote of directors for any board action; (c) unanimous approval for ratification of all committee action; (d) one class of directors; and (e) stockholder approval for indemnification of directors. After a preliminary discussion with Collins, it became clear to Musgrove that if the consents were effective, further action by the Frantz board would be invalid without Fritzsche's approval.

Musgrove acted promptly to try to regain control for Frantz management. He postponed the directors' meeting which had been scheduled for April 19; told the Bacon, Stifel investment banking firm to stop working on the valuation for the ESOP which was scheduled to be presented at the April 19 board meeting; cancelled a retire-

---

3. The corporate resolution stated:
Resolved, that the proper officers of this corporation be and hereby are directed to do all things necessary and proper for funding the Frantz Manufacturing Company Employee Stock Ownership Plan and Trust ("ESOP"): said officers to have discretion within the following limits: (a) funding shall be in the amount of 100,000 to 125,000 shares of Company stock sold from treasury or from authorized but unissued stock; (b) the company shall either lend the purchase price to the ESOP or guarantee an ESOP loan from a qualified third party; and (c) the price per share shall not exceed fair market value.

4. EAC purchased five blocks of stock on April 17, 1985, to reach majority control. EAC paid $37 per share to SMC for 57,400 shares, to Northern for 237,901 shares, to Rosenow for 32,499 shares, and to the Wyne Foundation for 11,800 shares, and granted each of them 3 year options to purchase an additional amount of EAC stock for $8 per share. SMC, Northern, and the Wyne Foundation received a cash payment of $2.50 per share and received notes for the balance of the purchase price, but Rosenow received $37 per share in cash. In addition, EAC purchased 37,500 shares from Pioneer III, Inc., for $40 per share, all in cash.

ment dinner planned that evening for Rosenow, Rutt, and Bivin; and traveled to Chicago to meet with Collins and special counsel retained to prevent the EAC takeover from being effective.

On Monday, April 22, Frantz asked Bacon, Stifel to complete the interrupted valuation study so that the Frantz ESOP could be funded that day. Musgrove called a meeting of the ESOP trustees for that afternoon,[5] and told the other trustees that since the Frantz board had authorized funding the ESOP at its February 22 meeting, they had an obligation to fund the ESOP. Although the resolution by the board had authorized issuance of 100,000 to 125,000 shares to fund the ESOP, at the meeting the trustees only considered purchasing 125,000 shares from the Frantz treasury to fund the ESOP. Musgrove told the other trustees to accept Bacon, Stifel's valuation of $34 per share, and to finance this $4.25 million stock purchase with a loan from Frantz at prime rate rather than through a guaranteed bank loan at less than prime because the EAC bylaw amendments requiring unanimous director approval for board action might prevent board approval to guarantee the ESOP loan.

Next, Musgrove called a directors meeting for April 24. As a "courtesy," Musgrove invited Fritzsche to the meeting, but Fritzsche was invited to participate only as an observer. Before the meeting, the Frantz directors, without Fritzsche, met for lunch and learned that the ESOP had been funded.

Musgrove, conducted the April 24 directors meeting[6] according to a prepared script, and the board mechanically adopted bylaw amendments that restricted the use

of the consent procedure,[7] established an executive committee,[8] and approved the funding of the ESOP. If the issuance of treasury shares to the ESOP was effective, EAC then lost its control of a majority of Frantz shares.

It is at this point that EAC sought a preliminary injunction in the Court of Chancery to nullify the actions taken by the Frantz board to deprive it of control, and Frantz, in turn, counterclaimed, seeking a determination that the bylaw amendments imposed on Frantz by EAC were invalid. The Court of Chancery issued an injunction on June 28, 1985, granting relief to EAC Industries against Frantz and its directors. On appeal, Frantz asserted that the Court of Chancery erred by granting the preliminary injunction to enforce the amendments to the Frantz bylaws which EAC had imposed on Frantz and that the court erred in enjoining the funding of the ESOP by the Frantz board.

### III.

Frantz has conceded that EAC complied with the mechanics of the consent procedure of 8 *Del.C.* § 228, which permits majority shareholders to obtain immediate action from corporate officials without review or delay. *See Datapoint Corp. v. Plaza Securities Co.,* Del.Supr., 496 A.2d 1031 (1985). Therefore, the issues which this Court must address are: (A) whether the EAC amendments enacted by shareholder consents during a change in control of the corporation were illegal and unfair in operation; (B) whether EAC effectively established and retained its majority position because Frantz' funding of the ESOP was invalid; and (C) whether Rosenow breached his fiduciary duty to the corporation and its

---

5. The trustees of the ESOP were Musgrove and two officers of Frantz: McCormick, the company treasurer, and Froelinger, Frantz' controller.

6. All of Frantz' directors except Rosenow attended. Fritzsche and his attorney attended the meeting, but Fritzsche was not permitted to participate as a director or vote.

7. Frantz' bylaw amendment prohibited use of the 8 *Del.C.* § 228 consent procedure unless the shareholder had given twenty days notice to other shareholders.

8. The executive committee was vested with the authority to discharge the responsibilities of the board, including the power to declare dividends and issue stock, including treasury shares.

shareholders by selling his stock and tendering his resignation to EAC.

### A.

The power to make and amend the bylaws of a corporation has long been recognized as an inherent feature of the corporate structure. 8 W. Fletcher, *Cyclopedia of the Law of Corporations* § 4176 (rev. perm. ed. 1982). The bylaws of a corporation are presumed to be valid, and the courts will construe the bylaws in a manner consistent with the law rather than strike down the bylaws. *Id.* § 4184. A bylaw that is inconsistent with any statute or rule of common law, however, is void, *Id.* § 4185; *see Kerbs v. California Eastern Airways, Inc.*, Del.Supr., 90 A.2d 652, 659 (1952), and bylaws must be reasonable in their application. *Schnell v. Chris-Craft Industries, Inc.*, Del.Supr., 285 A.2d 437 (1971); *State v. Jessup & Moore Paper Co.*, Del.Supr., 77 A. 16 (1910).

This appeal from a decision of the Court of Chancery on the validity and fairness of EAC's bylaw amendments involves a mixed question of law and fact. Therefore, the proper standard of review requires this Court to reverse the findings of the lower court only if the findings below are "clearly wrong and the doing of justice requires their overturn." *Levitt v. Bouvier*, Del.Supr., 287 A.2d 671, 673 (1972). We find no error in the Court of Chancery's findings on the EAC amendments of the Frantz bylaws and affirm the ruling as to the validity of the bylaw changes.

The bylaw amendments were unique in that they required attendance of all directors for a quorum and unanimous approval of the board of directors before board action can be taken, and they thereby limited the functioning of the Frantz board. *Schnell* prohibits incumbent management from entrenching itself by taking action which, though legally possible, is inequitable. In this case, however, the Court of Chancery found that the restrictions placed on the Frantz board were intended to limit the Frantz board's anti-takeover maneuvering after EAC had gained control of the corporation. We agree with the Court of Chancery that the EAC bylaw amendments were a permissible part of EAC's attempt to avoid its disenfranchisement as a majority shareholder and hold that the bylaw amendments should be given effect as of the date of the consents. Therefore, the EAC amendments effectively seated Fritzsche on the Frantz board, and nullified any board action taken after April 18, 1985 without the unanimous consent of all board members.

### B.

The directors of Frantz argue that the February 22, 1985 board resolution empowered the Frantz board to fund the ESOP with treasury shares after the board had learned of EAC's acquisition of a majority of Frantz shares and EAC's other actions to consolidate its position. If the ESOP plan had been carried out as it had been presented to the board on February 22, the incidental dilution of EAC's holdings might have withstood attack. However, whatever the intentions of the Frantz directors may have been on February 22 in authorizing an ESOP, the Court of Chancery found that the board never considered funding an ESOP as a takeover defense by increasing the number of outstanding shares and thereby diluting majority status of an existing stockholder. The board had considered the funding of an ESOP only in connection with taking the company private, where the plan would have decreased the number of outstanding Frantz shares.

Funding the ESOP in the manner it was done prior to the meeting of the board on April 24, 1985, was unauthorized. Furthermore, when the directors ratified the unauthorized funding of the ESOP at the April 24 meeting of the Frantz directors, they were without power to do so by less than unanimous vote. By that time EAC had effectively changed the Frantz bylaws. Since the EAC amendments to the bylaws were valid, such bylaws prevented the

Frantz board from ratifying the funding of the ESOP without Fritzsche's consent.

This Court has often held that when a board acts for the sole or primary purpose of perpetuating its own control, this improper motive overrides the ordinary protection of the business judgment rule. *See Unocal Corp. v. Mesa Petroleum Co.*, Del. Supr., 493 A.2d 946 (1985); *Aronson v. Lewis*, Del.Supr., 473 A.2d 805 (1984); *Pogostin v. Rice*, Del.Supr., 480 A.2d 619 (1984); *Schnell*, 285 A.2d at 439. *See also Johnson v. Trueblood*, 629 F.2d 287, 292 (3d. Cir.1980) *cert. denied*, 450 U.S. 979, 101 S.Ct. 1704, 68 L.Ed.2d 200 (1981); *Podesta v. Calumet Industries, Inc.*, [1978 transfer binder] Fed.Sec.L.Rep. (CCH) ¶ 96,433 (N.D.Ill.1978) (applying Delaware law). The Court of Chancery held that the primary purpose of the Frantz board in agreeing to the funding of the ESOP and in adopting the defensive actions taken between April 18 and 24 was to perpetuate their control of the company. Following the proper standard of review, this Court must agree that the evidence supports a finding that the primary purpose of funding the ESOP at the time the Frantz directors attempted to fund it was to perpetuate their control of the company.

■ Although the directors generally act under the protection of the business judgment rule both in prospective measures and in reactive measures seeking to ward off a threatened hostile takeover, corporate action which seeks to undo a takeover bid *after* control has already passed to another group is not protected by the business judgment rule. Therefore, the measures here taken constituted inequitable conduct. *See Moran v. Household International, Inc.*, Del.Ch., 490 A.2d 1059 (1985), *aff'd* 500 A.2d 1346 (1985); *Schnell*, 285 A.2d at 439; *Condec Corp. v. Lunkenheimer*, Del.Ch. 230 A.2d 769 (1967). In *Unocal*, this Court did not address the issue of whether a board of directors could take retrospective defensive measures against a majority stockholder by divesting the majority stockholder of his statutory right of control. *Unocal* dealt with the duty of care owned by directors in addressing a possible or a pending takeover of a corporation, not an accomplished takeover. Here, Frantz' activities after April 18 were attempts to defeat the accomplished takeover.

### C.

■ The board of directors is given the statutory power to deal in its own stock along with the authority to make and amend bylaws and to manage the business of the corporation under the protection afforded by the business judgment rule. 8 *Del.C.* § 160(a). This broad authority allows a Delaware corporation to deal selectively with its stockholders, so long as the directors have not acted out of the sole or primary purpose to entrench themselves in office. *Unocal*, 493 A.2d at 953–54.

■ Frantz asserts that EAC and Thomas Rosenow acted improperly when Rosenow's shares were sold to EAC and at the same time Rosenow submitted his resignation to EAC. It is clear of course that as a director, Mr. Rosenow was in a fiduciary relationship with the corporation and its shareholders. However, it is also clear that directors have the right to deal freely with their shares of stock and to dispose of them at the best price they are able to obtain, so long as they are acting in good faith. 3 W. Fletcher, *Cyclopedia of the Law of Private Corporations*, § 900 (rev. perm. ed. 1982); *see also Wellman v. Dickinson*, 682 F.2d 355 (2d Cir.1982); *Treadway Co. v. Care Corp.*, 638 F.2d 357 (2d Cir.1980) (applying New Jersey law). As a general rule, a director has no duty to disclose his stock dealings to the corporation, nor does he have a duty to offer his shares to the corporation before selling them to another. *Treadway* at 377. Directors are also free to resign.

■ We find no reason to upset the Court of Chancery's finding that Thomas Rosenow did not breach his fiduciary duty to the Frantz stockholders when he resigned his directorship and sold his shares to EAC. We find no merit in Frantz' contentions that Rosenow breached the fiduciary duties set out by this Court in *Unocal*.

## IV.

To summarize, we hold that bylaw amendments properly enacted by the shareholder consent procedure are not inequitable under the circumstances. We find that funding an ESOP in response to a shift in ownership of a corporation is not valid because the directors' action was not taken under the provision of the then valid bylaws. Finally, we find that a director of a corporation whose imminent retirement is known to the other members of the board does not violate his fiduciary duties to the corporation and its shareholders by tendering his resignation at the same time he sells his stock in the corporation.

For the reasons stated, we agreed with the conclusions of the Court of Chancery and, therefore, issued an order affirming that court.