# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| MARTIN SIEGEL, individually and on behalf of all others similarly situated, | ) ) ) | |
| Plaintiff, | ) ) ) | |
| v. | ) ) | C.A. No. 2024-0628-NAC |
| JAY MORSE, GERARD M. ANDERSON, JANET DAVIDSON, ANDRÉS GLUSKI, HOLLY KELLER KOEPPEL, JULIE LAULIS, ALAIN MONIÉ, MOISÉS NAIM, TERESA SEBASTIAN, MAURA SHAUGHNESSY, TARUN KHANNA, and THE AES CORPORATION, | ) ) ) ) ) ) ) ) ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION

Date Submitted: November 20, 2024
Date Decided: April 14, 2025

Gregory V. Varallo, Andrew E. Blumberg, Daniel E. Meyer, BERNSTEIN LITOWITZ BERGER & GROSSMANN LLP, Wilmington, Delaware; Christine M. Mackintosh, Rebecca A. Musarra, Vivek Upadhya, William G. Passannante II, GRANT & EISENHOFER P.A., Wilmington, Delaware; Jeroen van Kwawegen, Christopher J. Orrico, Shiva Mohan, James Janison, BERNSTEIN LITOWITZ BERGER & GROSSMANN LLP, New York, New York; Lori Marks-Esterman, Jacqueline Y. Ma, OLSHAN FROME & WOLOSKY, New York, New York; Michele S. Carino, GREENWICH LEGAL ASSOCIATES, LLC, Greenwich, Connecticut; *Counsel for Plaintiff Martin Siegel.*

Blake Rohrbacher, Matthew W. Murphy, John M. O'Toole, RICHARDS, LAYTON & FINGER, P.A., Wilmington, Delaware; Marjorie P. Duffy, Elizabeth A. Benshoff, Daniel C. Loesing, JONES DAY, Columbus, Ohio; *Counsel for Defendants Jay Morse, Gerard M. Anderson, Janet Davidson, Andrés Gluski, Holly Keller Koeppel, Julie Laulis, Alain Monié, Moisés Naim, Teresa Sebastian, Maura Shaughnessy, Tarun Khanna, and The AES Corporation.*

**COOK, V.C.**

After receiving a vanilla presentation by outside counsel, the directors of a Delaware corporation amended the corporation's advance notice bylaws.

A stockholder, who neither intends to nominate a director to the board nor knows of anyone who does, challenges the amended bylaws. In his complaint, the stockholder asks this Court to conclude that the advance notice bylaws are unenforceable and that the corporation's directors breached their fiduciary duties by adopting them. But, as Delaware Supreme Court precedent instructs, this Court must be presented with a ripe controversy before it undertakes equitable review of a corporation's bylaws.

The defendants have moved to dismiss per Court of Chancery Rules 12(b)(1) and 12(b)(6). Because the plaintiff's claims are unripe, the defendants' motion is granted.

## I. FACTUAL BACKGROUND

Plaintiff Martin Siegel is a stockholder of The AES Corporation ("AES" or the "Company").[1] AES is a Delaware-incorporated energy company.[2]

In August 2023, the Company's board of directors (the "Board") amended AES's advance notice bylaws (the "Advance Notice Bylaws").[3] At that time, the Board consisted of Jay Morse, Gerard M. Anderson, Janet Davidson, Andrés Gluski, Holly

---

[1] *Martin Siegel v. Jay Morse, et al.*, C.A. No. 2024-0628-NAC, Docket ("Dkt.") 62, Verified Am. S'holder Class Action Compl. ("Am. Compl.") ¶ 19.

[2] *Id.* ¶ 31.

[3] *Id.* ¶ 45.

Keller Koeppel, Julie Laulis, Alain Monié, Moisés Naim, Teresa Sebastian, Maura Shaughnessy, and Tarun Khanna (together with AES, the "Defendants").[4]

In June 2024, Plaintiff commenced this action challenging the Advance Notice Bylaws, ten months after their adoption.[5] Plaintiff neither intends to nominate a director to the AES Board, nor is aware of any stockholder who does.[6]

## A. The Advance Notice Bylaws

On July 31, 2023, against the backdrop of the SEC's adoption of Rule 14a-19 (the "Universal Proxy Rule"), AES's general counsel and outside counsel recommended that the Board refresh the Company's advance notice bylaws.[7] The Universal Proxy Rule had gone into effect a year prior, and in December 2022, the SEC had issued supplemental guidance clarifying that a company could still exclude stockholder nominees from its proxy card if "the dissident shareholder[] fail[s] to comply with [the Company's] advance notice bylaw requirements."[8] The presentation that the Board reviewed noted that "[r]ecent changes to the law, case law and market developments prompted [outside counsel's] fresh full review of AES' By-Laws," and cautioned that the adoption of the Universal Proxy Rule "[l]owers [the] barriers to

---

[4] *Id.* ¶¶ 20–31.

[5] Dkt. 1., Verified S'holder Class Action Compl.

[6] *See* Dkt. 39, Tr. of Oral Arg. on Pl.'s Mot. to Expedite and Defs.' Mot. to Stay 41:24–42:3, 13:5–11; Dkt. 80, Tr. of Oral Arg. on Defs.' Mots. to Dismiss 69:15–22.

[7] Am. Compl. ¶¶ 38, 40.

[8] *Id.* ¶ 38 (alterations in original).

run a proxy contest and to get at least one board seat."[9]  The presentation also noted that "[s]ince the universal proxy rule is expected to make it easier for activists to gain seats on boards, many companies are revisiting the informational and procedural requirements in their bylaws applicable to stockholder-submitted nominations and proposals to be able to mount a more effective defense, if necessary."[10]  Further confirming that revisiting advance notice bylaws was a common response to the Universal Proxy Rule, the presentation indicated that "[a]s of June 30, 2023, 44% of S&P 500 companies [had] amended their bylaws in connection with the adoption of the universal proxy rule."[11]

Outside counsel proposed the Board adopt "Enhanced Disclosure Requirements," requiring nominating stockholders to disclose additional information about themselves, their nominees, and anyone they were working with.[12]  Plaintiff alleges that these "Enhanced Disclosure Requirements" were "designed to make compliance with the Advance Notice Bylaw[s] even more difficult."[13]  The presentation suggested that similar advance notice bylaws had recently been upheld by this Court and that these bylaws had "resulted in the invalidation of director

---

[9] *Id.* ¶ 40 (screenshot of AES_220_000021).

[10] *Id.* ¶¶ 40–41 (screenshot of AES_220_000022).

[11] *Id.* ¶¶ 40–41 (emphasis omitted) (screenshot of AES_220_000022).

[12] *Id.* ¶ 42 (screenshot of AES_220_000026).

[13] *Id.*

nominations submitted by stockholders."[14] But the presentation also warned that "[s]tockholders have filed suits challenging certain 'draconian' advance notice provisions that allegedly serve only to entrench the board."[15]

On August 1, 2023, the Board formally adopted the Advance Notice Bylaws.[16] Plaintiff does not challenge the facial validity of the Advance Notice Bylaws,[17] but takes issue with two features of the Advance Notice Bylaws: (1) the "Acting in Concert" definition, and (2) the "Ownership Provision."

### 1. Acting in Concert Definition

Section 9.01(C) of the Advance Notice Bylaws requires disclosure of any compensation or reimbursement in the past three years and "any other relationships, between or among any Nominating Person or Eligible Stockholder . . . and each proposed nominee, and his or her respective affiliates and associates, or others acting in concert therewith."[18] The Advance Notice Bylaws also provide that:

> [A] person shall be deemed to be "acting in concert" with another person if such person knowingly acts (whether or not pursuant to an express agreement, arrangement or understanding) in concert with, or towards a common goal relating to the management, governance or control of the Corporation in parallel with, such other person where (i) each person is conscious of the other person's conduct or intent and this awareness is an element in their decision-making processes and (ii) at least one

---

[14] *Id.* ¶ 43 (screenshot of AES_220_000029).

[15] *Id.*

[16] *Id.* ¶ 45.

[17] *Id.* at 2 n.3 ("For the avoidance of doubt, Plaintiff does not challenge the facial validity of the [Advance Notice Bylaws].").

[18] *Id.* ¶¶ 49–51 (emphasis omitted).

4

additional factor suggests that such persons intend to act in concert or in parallel, which such additional factors may include, without limitation, exchanging information (whether publicly or privately), attending meetings, conducting discussions or making or soliciting invitations to act in concert or in parallel . . . . A person deemed to be "acting in concert" with another person shall be deemed to be "acting in concert" with any third party who is also "acting in concert" with such other person.[19]

## 2.      Ownership Provision

Section 2.16(B) of the Advance Notice Bylaws (the "Ownership Provision") requires nominating stockholders to disclose any equity interest in the Company (including synthetic and derivative ownership interests, short interests, and hedging arrangements), along with their history of ownership of stock or derivative interest in the Company.[20]  The Ownership Provision also instructs nominating stockholders and anyone they are "acting in concert" with to disclose any performance-related fees they would receive should the Company's stock appreciate or depreciate.[21]  Finally, the Ownership Provision requires disclosure of any "material relationship with" or any "direct or indirect material interest in any material contract or agreement" with either the Company or any "principal competitor" held by the nominating stockholder and anyone they are "acting in concert" with.[22]

---

[19] *Id.* ¶ 51 (omission in original).

[20] *Id.* ¶ 64–65.

[21] *Id.* ¶ 66.

[22] *Id.* ¶ 64.  For the complete text, see Am. Compl. ¶¶ 64–68; Am. Compl. Ex. 3.  The Board amended the Ownership Provision on October 3, 2024.  Dkt. 71, Pl.'s Answering Br. in Opp. to Defs.' Mot. to Dismiss at 15–17; *see also id.* at 18 ("Plaintiff does not believe the

**B. Procedural History**

On June 7, 2024, following a books and records demand under 8 *Del. C.* § 220, Plaintiff filed his complaint.[23] In the complaint, Plaintiff asserted that the Advance Notice Bylaws were "facially invalid,"[24] and sought a declaration that the Advance Notice Bylaws were "invalid, illegal, and void."[25] Plaintiff also alleged that the Directors had breached their fiduciary duties by adopting the Advance Notice Bylaws.[26]

Plaintiff moved to expedite.[27] On June 20, 2024, Defendants moved to stay this action pending the Delaware Supreme Court's decision in *Kellner v. AIM ImmunoTech Inc.* ("*Kellner II*").[28] On June 26, 2024, after oral argument, I denied both motions.[29]

During oral argument on the motions, Plaintiff's counsel attributed the ten-month delay between the Company's adoption of the Advance Notice Bylaws and

---

changes bear on the present motion because they do not cure the underlying breaches of fiduciary duty . . . .").

[23] Verified S'holder Class Action Compl.

[24] *Id.* ¶ 44.

[25] *Id.* at 25.

[26] *Id.* ¶ 81.

[27] Dkt. 6. Pl.'s Mot. for Expedited Disc. and Setting a Prompt Trial Date.

[28] Dkt. 17, Defs.' Mot. to Stay ¶¶ 5–6.

[29] Tr. Oral Arg. on Pl.'s Mot. to Expedite and Defs.' Mot. to Stay 52:11–13.

6

Plaintiff's filing suit to what counsel perceived as a change in our law.[30]  Counsel

explained that, although Delaware case law at the time the Advance Notice Bylaws

were adopted seemed to preclude the sort of facial validity claims that Plaintiff was

bringing, perceived developments in the law since then had led counsel to believe that

our courts were, in fact, receptive to such claims.[31]  Plaintiff's counsel made plain that

Plaintiff was "asserting claims on behalf of all the shareholders for breach of fiduciary

duty seeking a judgment declaring the improper bylaw provisions facially invalid."[32]

Counsel revealed additional insight into the rationale for Plaintiff's facial

validity claims, explaining:

> Do we have a stockholder coming up and saying I want to nominate, but
> I'm not going to do it because these provisions are so difficult?  No.  But
> candidly, living in this world, Your Honor, that is the unicorn that — I
> hope it exists somewhere, but it just doesn't — you have to really find
> one.  That is why the claims are challenged facially.  That is why
> candidly my partner Steve Wolosky stepped up as a representative
> plaintiff in *Williams*.[33]

---

[30] *Id.* 40:10–23 ("On the issue of the timing of the bylaws relative to the filing of the complaint, there is no doubt that it was the [Court of Chancery's] [*Kellner v. AIM ImmunoTech Inc*] ruling in the end of December that, I will say, opened the door for a — the potential for a facial challenge to advance notice bylaws. [307 A.3d 998 (Del. Ch. 2023) ("*Kellner I*").]  As [Defendants' counsel] notes, the case law previously under *Boilermakers* made clear or clear enough that — and there's one other, but the name is escaping me for a moment — where the path for a facial challenge to advance notice bylaws did not previously exist or appear to exist.  And there's no doubt that the *Kellner [I]* ruling changed that.  That's why the Court has seen what they have seen with the — what we all know is the flood of filings.")

[31] *Id.*

[32] *Id.* 5:14–17.

[33] Tr. of Oral Arg. on Pl.'s Mot. to Expedite and Defs.' Mot. to Stay 41:24–42:9.

7

Two weeks later, on July 11, 2024, the Delaware Supreme Court issued its *Kellner II* decision.[34] A month after that, I granted Defendants' motion to stay discovery, writing:

> Plaintiff challenges advance notice bylaw terms adopted a year ago. Plaintiff says he asserts a facial validity challenge. Mot. to Exp. Hr'g Tr. ([Dkt.] 39) ("MTE Tr.") at 5 (seeking "judgment declaring the improper bylaw provisions facially invalid"). Yet, Plaintiff argues enhanced scrutiny review applies.
>
> Our high court's recent decision in *Kellner [II]* seems to foreclose this path. "When a validity challenge is raised, . . . the court should undertake an analysis distinct from enhanced scrutiny review." *Kellner II*[, 320 A.3d 239, 262 (Del. 2024)]. Plaintiff points to no pending or imminent proxy contest. Nor can Plaintiff identify a stockholder who is "chilled." Plaintiff instead leans on excerpts from two slides prepared by counsel. Rather than suggesting a selfish or disloyal motive, the text seems generic and likely found in many law firm memoranda.[35]

On September 4, 2024, Plaintiff amended his complaint.[36] Quite notably, in a complete reversal from three months prior, Plaintiff now expressly purported to disclaim any facial validity challenge, stating in a footnote: "For the avoidance of doubt, Plaintiff does not challenge the facial validity of the [Advance Notice] Bylaws."[37] Plaintiff continued to allege that Defendants breached their fiduciary duties by adopting bylaws that "inequitably chill the fair exercise of the AES

---

[34] 320 A.3d 239 (Del. 2024).

[35] Dkt. 55, Order Granting Defs.' Mot. to Stay Disc. at 3.

[36] Am. Compl.

[37] *Id.* at 2 n.3.

stockholders' franchise."[38] But Plaintiff now asserted that I should declare the Advance Notice Bylaws "unenforceable," rather than "invalid, illegal, and void."[39] Plaintiff still neither intended to nominate a director to the Board, nor could Plaintiff identify a stockholder who did.

On September 23, 2025, Defendants moved to dismiss the amended complaint under Court of Chancery Rules 12(b)(1) and 12(b)(6).[40] On November 20, 2024, I heard oral argument on the motion.[41]

## II. ANALYSIS

In *Kellner II*, our Supreme Court clarified that, when board-adopted advance notice bylaws are challenged, this Court reviews the bylaws first for legality, if contested, and second for equity.[42]

This Court undertakes a legal review if the facial validity of a bylaw is challenged.[43] "Under Delaware law, bylaws are 'presumed to be valid' and must be

[38] Am. Compl. ¶ 85.

[39] *Compare* Am. Compl. at 30, *with* Verified S'holder Class Action Compl. at 25.

[40] Dkt. 66. Defs' Mot. to Dismiss the Am. Compl.

[41] The plaintiff in *George Assad v. Brian Chambers, et al*, C.A. No. 2024-0688-NAC, filed a nearly identical complaint against the directors of the Owens Corning Corporation weeks after Plaintiff filed this class action. The parties in both cases are clients of the same few law firms. Although the two cases were never formally coordinated, counsel argued the two motions to dismiss at the same hearing.

[42] *See, e.g.*, *Kellner II*, 320 A.3d at 259 ("[W]hen corporate action is challenged, it must be twice-tested – first for legal authorization, and second by equity. The same principles apply to board-adopted advance notice bylaws." (footnote omitted)).

[43] *Id.* at 258–60.

9

interpreted 'in a manner consistent with the law.'[44]  But "[a]n invalid bylaw is *ab initio* void."[45]  A bylaw is facially valid if it is "authorized by the Delaware General Corporation Law (DGCL), consistent with the corporation's certificate of incorporation, and not otherwise prohibited."[46]  To succeed in bringing a facial validity claim, a plaintiff "must demonstrate that the bylaw cannot operate lawfully under any set of circumstances."[47]  "[I]t is insufficient for a plaintiff to simply assert that 'under some circumstances, a bylaw might conflict with a statute, or operate unlawfully.'"[48]

This Court undertakes an equitable review when presented with an "enforceability" or "as-applied" challenge.[49]  Generally, "[t]o pass judicial review, bylaws must, as a matter of equity, 'be reasonable in their application' and not unfairly interfere with stockholder voting."[50]  When this Court concludes an

---

[44] *Id.* at 258 (quoting *Frantz Mfg. Co. v. EAC Indus.*, 501 A.2d 401, 407 (Del. 1985)).

[45] *Kellner II*, 320 A.3d at 262 n.153 (citing *Michelson v. Duncan*, 407 A.2d 211, 218–19 (Del. 1979)).

[46] *Kellner II.* 230 A.3d at 258 (quoting *ATP Tour, Inc. v. Deutscher Tennis Bund*, 91 A.3d 554, 557–58 (Del. 2014)).

[47] *Kellner II*, 320 A.3d at 258.

[48] *Id.* (quoting *ATP Tour, Inc.*, 91 A.3d at 558).

[49] *Kellner II*, 320 A.3d at 258–59.

[50] *Id.* at 259 (quoting *Frantz*, 501 A.2d at 407 (footnote omitted)).

10

otherwise valid bylaw operates inequitably, the bylaw is "rendered unenforceable" in the circumstances.[51]

But equitable review of advance notice bylaws is not always permitted. For this Court to undertake such a review, it must first be presented with a ripe dispute.[52] And that makes sense, because the remedy for an enforceability or as-applied challenge is to declare the bylaw unenforceable in some respect,[53] and having a ripe dispute allows this Court to specify against whom the bylaw cannot be enforced.

Because Plaintiff has disclaimed a facial validity challenge but has not demonstrated that a ripe controversy exists, this Court grants Defendants' motion to dismiss under Rule 12(b)(1).[54] As such, Defendants' motion to dismiss per Rule 12(b)(6) is moot.

---

[51] *Kellner II.* 320 A.3d at 260, 262 n.153 ("A valid bylaw, when inequitable, is rendered unenforceable.").

[52] *Kellner II*, 320 A.3d at 258–59, 258 n.139; *Boilermakers*, 73 A.3d at 952 n.80 (noting "an as-applied challenge . . . should be addressed when the issue is actually ripe").

[53] *Kellner II*, 320 A.3d at 262 n.153.

[54] Following this Court's decision in *Kellner I*, Plaintiff brought this action "for breach of fiduciary duty, seeking a judgment declaring the [Advance Notice Bylaws] facially invalid." Tr. of Oral Arg. on Pl.'s Mot. to Expedite and Defs.' Mot. to Stay 5:13–17. After *Kellner II* explained that facial validity challenges are limited to assessments of "whether [a] bylaw is contrary to law or the certificate of incorporation and addresses a proper subject matter," Plaintiff amended his complaint to disavow any facial validity challenge. *Kellner II*, 320 A.3d at 263. The amended complaint changes much verbiage, as one would expect. But the gravamen remains the same as before. Indeed, Plaintiff points to the same slides, challenges the same bylaw text, cites the same case law concerning chilling effect, and still cannot identify a stockholder who either intends to run a proxy contest, is considering running one, or, for that matter, says he, she or it is "chilled." And it appears Plaintiff seeks a declaration that the bylaw is "unenforceable" as to all stockholders, which, for practical purposes, mirrors the relief Plaintiff would obtain if he were to succeed on a facial validity challenge—*i.e.*, a

11

## A. The Standard of Review

If a party moves to dismiss under Rule 12(b)(1), the non-movant bears the burden of establishing subject matter jurisdiction.[55] "Unlike the standards employed in Rule 12(b)(6) analysis, the guidelines for the Court's review of [a] Rule 12(b)(1) motion are far more demanding of the non-movant."[56] Dismissal under Rule 12(b)(1) is appropriate if the record, including evidence outside the pleadings, indicates that the court does not have subject matter jurisdiction.[57]

## B. Plaintiff's Claims Are Not Ripe

"Ripeness, the simple question of whether a suit has been brought at the correct time, goes to the very heart of whether a court has subject matter jurisdiction."[58] "Delaware courts decline to exercise jurisdiction over a case unless

---

declaration that the bylaw is invalid under all circumstances. The fact is that Plaintiff fails to plead a ripe basis to trigger equitable review and that Plaintiff's challenge remains what it always was: a facial validity challenge. But Plaintiff now expressly disclaims such a claim, almost certainly recognizing the limited scope of facial validity challenges after *Kellner II*.

[55] *E.g.*, *de Adler v. Upper New York Inv. Co. LLC*, 2013 WL 5874645, at *7 (Del. Ch. Oct. 31, 2013).

[56] *CLP Toxicology, Inc. v. Casla Bio Hldgs LLC*, 2021 WL 2588905, at *8 (Del. Ch. June 14, 2021) (alteration in original) (quoting *Appriva S'holder Litig. Co., LLC v. EV3, Inc.*, 937 A.2d 1275, 1284 n.14 (Del. 2007)).

[57] *K&K Screw Prods., L.L.C. v. Emerick Cap. Invs., Inc.*, 2011 WL 3505354, at *6 (Del. Ch. Aug. 9, 2011).

[58] *Bebchuk v. CA, Inc.*, 902 A.2d 737, 740 (Del. Ch. 2006).

12

the underlying controversy is ripe . . . ."[59]  In other words, this state's courts "do not render advisory or hypothetical opinions."[60]

"A ripeness determination requires a common sense assessment of whether the interests of the party seeking immediate relief outweigh the concerns of the court 'in postponing review until the question arises in some more concrete and final form.'"[61] This Court declines to exercise subject matter jurisdiction on ripeness grounds where doing so "would prematurely resolve a highly contentious and important matter before the court knows what pertinent facts might develop in the future."[62]

In line with our courts' practice of adjudicating only ripe disputes, "Delaware law does not permit challenges to bylaws based on hypothetical abuses . . . ."[63]  "A bylaw dispute is ripe when litigation is 'unavoidable' and the 'material facts are static.'"[64]  In other words, this Court will undertake an equitable review of bylaws

---

[59] *XL Specialty Ins. Co. v. WMI Liquidating Tr.*, 93 A.3d 1208, 1217 (Del. 2014) (citing *Stroud v. Milliken Enters., Inc.*, 552 A.2d 476, 480 (Del. 1989) ("*Stroud I*")).

[60] *XL Specialty Ins. Co.*, 93 A.3d at 1217.

[61] *Id.* (quoting *Stroud I*, 552 A.2d at 480).

[62] *Bebchuk*, 902 A.2d at 744.

[63] *Openwave Sys. Inc. v. Harbinger Cap. P'rs Master Fund I, Ltd.*, 924 A.2d 228, 240 (Del. Ch. 2007) (first citing *Stroud v. Grace*, 606 A.2d 75, 96 (Del. 1992) ("*Stroud II*"); and then citing *Bebchuk*, 902 A.2d at 741); *see also Stroud II*, 606 A.2d at 79 ("Delaware courts should exercise caution when invalidating corporate acts based upon hypothetical injuries . . .").

[64] *Kellner II*, 320 A.3d at 259 n.139 (citing *Stroud I*, 552 A.2d at 481).

13

only if it has a "'genuine, extant controversy' involving the adoption, amendment, or application of bylaws," before it.[65]  This is not such a case.

Plaintiff's challenge to the Advance Notice Bylaws is a hypothetical one. Plaintiff admits he is uninterested in running a proxy contest,[66] but alleges that the Advance Notice Bylaws "chill and impermissibly burden the free exercise of the stockholder franchise."[67]  Yet Plaintiff does not point to a single stockholder who is deterred by the Advance Notice Bylaws from nominating a director for election to the AES Board.  And Plaintiff does not even allege that any of Advance Notice Bylaws' disclosure requirements that he challenges would apply to him if he were to submit a nomination.  For instance, Plaintiff objects to the Ownership Provision's requirement for disclosure of performance-related fees, or "carry," since "[d]emanding disclosure of such commercially sensitive information to the Company can deter stockholders from making nominations in the first place."[68]  But Plaintiff does not allege that he charges performance-related fees such that this disclosure requirement would apply to him if he were to make a nomination.

Plaintiff asks this Court to review the Advance Notice Bylaws now, even though no stockholder presently seeks to nominate a director for election to the AES

---

[65] *Kellner II*, 320 A.3d at 258 (quoting *Boilermakers*, 73 A.3d at 949).

[66] Tr. of Oral Arg. on Defs.' Mot. to Dismiss 69:17–22.

[67] Am. Compl. ¶ 83.

[68] Am. Compl. ¶¶ 66–67.

Board. Whether any stockholder will attempt to do so in the future is unknown, and the facts that might arise are not static.[69] So this is precisely the sort of case in which the Court should "postpon[e] review until the question arises in some more concrete and final form."[70] This Court "cannot be expected to guess whether or how the dispute in this case might eventually crystallize, and to announce a sweeping legal rule, which addresses all those possibilities . . . ."[71] And, tellingly, Plaintiff does not cite to a single case where this Court has allowed a stockholder to challenge the enforceability of an advance notice bylaw when no stockholder at least is considering or intends to run a proxy contest.[72] Plaintiff's counsel conceded as much during oral argument.[73]

Instead, referencing the slides the Board reviewed when considering the Advance Notice Bylaws, Plaintiff asserts that he "adequately plead[ed] that the Board acted defensively in adopting the [Advance Notice Bylaws]" which "suffices to state a ripe *Unocal* claim."[74] Not so. Although "Delaware courts scrutinize closely

---

[69] For example, a stockholder who decides to nominate a director could be an individual stockholder to whom some of the disclosure requirements that Plaintiff challenges, such as the requirement to disclose performance-related fees, will not apply.

[70] *Bebchuk*, 902 A.2d at 740 (quoting *Stroud I*, 552 A.2d at 480).

[71] *Bebchuk*, 902 A.2d at 744.

[72] *See* Am. Compl. It should not be lost on anyone that the *Kellner* decisions involved a "prolonged proxy contest" and a ripe dispute. *E.g. Kellner II*, 320 A.3d at 259 n.139.

[73] *See* Tr. of Oral Arg. on Defs.' Mot. to Dismiss 63:8–21, 72.

[74] Pl.'s Answering Br. in Opp. to Defs.' Mot. to Dismiss at 20.

15

corporate acts that affect stockholder voting,"[75] as already explained, before a court will undertake such equitable review, it must be presented with a "genuine, extant controversy."[76] Pointing to excerpts from a few slides from a slide deck is just not enough, in these circumstances, to demonstrate that a genuine, extant controversy exists. Without a proxy contest, or even a stockholder saying he or she is chilled from making a nomination, a few slides with generic references to stockholder activism do not transform this dispute from an "imagined" one to a "real-world" one.[77] And as noted in a footnote to the *Kellner II* decision[78] and even on the slides reviewed by the AES Board,[79] the adoption of the Universal Proxy Rule prompted many other corporations to revisit their advance notice bylaws. Common sense suggests that, absent any proxy contest threat, the Board's decision here also to revise the Company's bylaws in response to the Universal Proxy Rule is not the kind of

---

[75] *Kellner II*, 320 A.3d at 259.

[76] *Id.* at 258 (quoting *Boilermakers*, 73 A.3d at 949).

[77] *Kellner II*, 320 A.3d at 259 n.139 ("Fiduciary review standards are meant to address 'real-world concerns when they arise in real-world and extant disputes, rather than hypothetical and imagined future ones.'" (quoting *Boilermakers*, 73 A.3d at 963)).

[78] *Kellner II*, 320 A.3d at 258 n.134 (citing Aaron Wendt & Krishna Shah, *2023 Proxy Season Briefing: Key Trends and Data Highlights*, Harvard Law School Forum on Corporate Governance (Aug. 17, 2023), https://corpgov.law.harvard.edu/2023/08/17/2023-proxy-season-briefing-key-trends-and-data-highlight/).

[79] Am. Compl. ¶ 41 (screenshot of AES_220_000022) ("As of June 30, 2023, 44% of S&P 500 companies had amended their bylaws in connection with the adoption of the universal proxy rule." (emphasis omitted)).

circumstance that the Supreme Court envisioned in *Kellner II* would trigger the machinery of equitable review.[80]

## C.      Stockholder Rights Plans and Dead Hand Proxy Puts Are Not Analogous

Plaintiff also attempts to sidestep the ripeness question by claiming that the Advance Notice Bylaws have "inequitably chill[ed] the fair exercise of the AES stockholders' franchise,"[81] and analogizing the supposed deterrent effect of the Advance Notice Bylaws to that of stockholder rights plans and dead hand proxy puts.[82]  Indeed, the amended complaint makes much of the notion that the Advance Notice Bylaws "include 'Wolfpack' and 'Daisy Chain' provisions substantially similar to the unenforceable entrenchment devices rejected in *Williams*."[83]

---

[80] If a couple of generic law firm slides demand equitable review here, why not, as a practical matter, in essentially every other bylaw case as well?  And how does that comport with what I perceive to be *Kellner II's* guidance?  As one follows this line of inquiry and its ensuing permutations, and considering the complexities associated with proxy contests as they are practiced in the real world, the wisdom of looking for a "real-world and extant dispute[], rather than hypothetical and imagined future ones[,]" becomes, at least to me, abundantly clear.  *Kellner II*, 310 A.3d at 259 n.139 (quoting *Boilermakers*, 73 A.3d at 963).  I further note the somewhat unusual posture in which the parties presented argument: simultaneously with *Assad v. Chambers*, which involves the adoption of advance notice bylaws by a different company.  If anything, this would seem at least consistent with the notion that the slides the AES Board reviewed here are beside the point and what Plaintiff really takes issue with is the text of the Advance Notice Bylaws and how that text may bear on "hypothetical and imagined future" proxy contests.

[81] Am. Compl. ¶ 85.

[82] *See, e.g.*, *id.* at 22 n.41 ("Moreover, like a rights plan, an advance bylaw issued preemptively that is never implicated is 'a truly effective deterrent.'" (emphasis omitted)).

[83] Am. Compl. ¶ 12.  The amended complaint's "one size fits all" conceptual approach is flawed here because, as discussed, it ignores critical nuances and instead flattens an otherwise complex analysis of the corporate machinery.  To take another example beyond what I discuss above, the amended complaint simply ignores the unique nature of the 5% trigger in *Williams* and its interplay with the challenged provisions in that case.  *See*

But, as Defendants ably explain, an advance notice bylaw is not like a stockholder rights plan or dead hand proxy put.[84] Those measures, when triggered, are characterized by "immediate and devastating" financial consequences, which are not present in the context of an advance notice bylaw.[85] For instance, in the context of a rights plan, if an acquiror takes action that triggers the rights, dramatic changes in the capital structure of the target company can result. The key feature of a rights plan is the "flip-in" provision of the rights, the effect of which is to impose unacceptable levels of dilution on an acquiror in specified circumstances. And triggering a dead hand proxy put can result in catastrophic changes to the company's capital structure by causing a default on the company's debt.[86]

---

*Williams*, 2021 WL 754593, at *35 ("[T]he 5% trigger alone distinguished the Plan; only 2% of all plans identified by Morgan Stanley had a trigger lower than 10%. Even among pills with 5% triggers, the Plan ranked as one of only nine pills to ever utilize a 5% trigger outside the NOL context. Among Delaware corporations, it was one of only two." (footnotes omitted)).

[84] Dkt. 67, Defs.' Opening Br. in Supp. of Mot. to Dismiss Am. Compl. at 48–49 ("While stockholder rights plans are essentially self-executing and impose potentially devastating financial consequences, advance notice bylaws are informational requirements that have no actual effect until a nomination is submitted to and evaluated by a board, and then only if the nomination is rejected for failure to comply.").

[85] *Id.* at 49 (quoting *Moran v. Household Int'l., Inc.*, 490 A.2d 1059, 1066 (Del. Ch. 1985)).

[86] Plaintiff's dead hand proxy put analogy relies heavily on an early *Healthways* transcript. *E.g.*, Tr. of Oral Arg. on Defs.' Mots. to Dismiss, at 30–33 (quoting *Pontiac Gen. Emp.'s Ret. Sys. v. Ballantine*, C.A. No. 9789-VCL, at 16, 72–74 (Del. Ch. Oct. 14, 2014) (TRANSCRIPT) ("*Healthways*")). Plaintiff's analogy, however, requires ignoring nuance. Indeed, the same judge, in the same case, later expressly warned against ignoring the fact-specific nature of that earlier ruling, which "addressed a dead hand proxy put, adopted in the shadow of a proxy contest." *Pontiac Gen. Emp.'s Ret. Sys. v. Ballantine*, C.A. No. 9789-VCL, at 35:10–36:5 (Del. Ch. May 8, 2015) (TRANSCRIPT) (describing earlier transcript as "probably one of the more frequently misrepresented or misunderstood rulings of mine" and that "[o]ne of the . . . factors that was misunderstood about that decision was it was generally

In contrast, when a nominating stockholder "triggers" an advance notice bylaw, the stockholder does not suffer devastating equity dilution, nor does the company confront a potentially ruinous debt acceleration. The stockholder instead faces a rejection of her nominees. In response, she may choose to engage with the company's board to address shortcomings in the nomination, sue, or do both, as routinely occurs.[87] Upon a rejection of nominees, the proverbial eggs are perhaps broken, but hardly scrambled; equity need not leap to the stove before anyone even considers a meal.

In sum, the consequences associated with stockholder rights plans and dead hand proxy puts are altogether different in kind. Plaintiff's analogies do not ripen otherwise unripe claims. Considering our Supreme Court's analysis in *Kellner II*, and taking a commonsense view of the circumstances as I am instructed to do, I am compelled to conclude Plaintiff's claims here are unripe.

## III.   CONCLUSION

Accordingly, Defendants' motion to dismiss is granted without prejudice.

---

viewed as if it applied to any change-in-control provision in any loan agreement, which, frankly, is specious."). Plaintiff does not include this explanation.

[87] As yet another alternative, stockholders may seek to repeal an advance notice bylaw. *Boilermakers*, 73 A.3d at 954 ("[U]nlike typical poison pills, board-adopted . . . bylaws are subject . . . to the most direct form of attack by stockholders who do not favor them: stockholders can simply repeal them by a majority vote.").